# In the United States Court of Federal Claims

No. 21-1641 L
(Filed: May 11, 2023)

* * * * * * * * * * * * * * * * * *

**GARY ANGELLY**, *et al.*,

              Plaintiffs,

v.

**THE UNITED STATES**,

              Defendant.

* * * * * * * * * * * * * * * * * *

*Adam M. Riley*, Flint Law Firm, LLC, argued the motions for Plaintiffs, *Ethan A. Flint*, Flint Law Firm, LLC, counsel of record, of Edwardsville, IL, for Plaintiffs.

*Laura W. Duncan,* Natural Resources Section, Environment and Natural Resources Division, U.S. Department of Justice, of Galveston, TX, with whom was *Edward C. Thomas*, *Dustin J. Weisman*, *Mark Pacella*, and *Paul Freeborne*, of Washington, DC, for Defendant.

## OPINION AND ORDER

On July 30, 2021, Plaintiffs—a group of farmers, business owners, and businesses—brought suit seeking just compensation for the alleged physical taking of flowage easements by the United States. Plaintiffs, who own land and other property along the Mississippi and Ohio Rivers, claim that government action, including the construction of river training structures designed to deepen and provide better alignment for the rivers' navigational channels, has caused atypical and unseasonal flooding that has effected a taking of their property without providing the constitutionally required just compensation. Plaintiffs claim that the nature and extent of this alleged atypical, unseasonal flooding did not become apparent until 2019 at the earliest.

Pending before the Court is the government's motion to dismiss Plaintiffs' claims under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). *See* ECF Nos. 14 & 15 ("Motion"). In its motion, the government asserts that the statute of limitations bars Plaintiffs' claims because Plaintiffs knew, or should have known, of all of the events that allegedly fixed the government's liability more than six years before Plaintiffs filed their complaint. In addition, the government contends that Plaintiffs' claims should be dismissed for failure to state a claim because Plaintiffs do not pinpoint a government action or actions that allegedly give rise to their claims, fail to allege that the government acted beyond its navigable

servitude, and their claims sound in tort.  For the reasons that follow, the government's motion is denied.

# BACKGROUND

Plaintiffs in this action include farmers, residents, and other landowners who own or operate on land in Kentucky and Illinois, within reach of the Mississippi or Ohio Rivers.  ECF No. 1 ("Compl.") ¶ 16; Compl. Ex. 1.  In their complaint, Plaintiffs readily admit that their properties have historically experienced regular, seasonal flooding in the winter and spring months.  *See* Compl. ¶ 121.  Plaintiffs state that the land at issue in this matter has "always been subject to flooding." *Id.* ¶ 8.  Specifically, "[f]looding in the winter and spring," has regularly occurred for as long as Plaintiffs have owned, or operated on, the properties.  ECF Nos. 22 & 23 ("Response") at 11, 14, 15, 16, 23; *see also* ECF No. 22-2 ("Angelly Decl.") ¶ 9.  In fact, "that flooding is what makes the land valuable for its intended purpose," *i.e.*, farming.  Compl. ¶ 8.  Accordingly, this regular pattern of flooding in the winter and spring does not interfere with Plaintiffs' ability to farm or otherwise cultivate their land.  After the ground is inundated with water in the winter and spring, it has historically dried by mid-July, in time for Plaintiffs to plant their crops.  *See, e.g.*, ECF No. 22-5 (Plaintiff declaring that "Spring flooding does not prevent me from planting a crop," and "[a]s long as the ground is dry by July 15, I am able to plant a crop.").

*River Training Structures*

Since the early nineteenth century, Congress has incrementally commissioned the Army Corps of Engineers ("Corps") to construct "navigation-related improvements to the Mississippi River and some of its tributaries, like the Ohio River."  ECF No. 14 ("Motion") at 3.[1]  Through a series of legislation, the Corps has been authorized to "obtain and maintain the navigation channel by building river training structures, dredging, and employing other stabilization measures."  *Id.* at 4.  Beyond these navigational works, Congress has also commissioned the implementation of "flood risk management measures that benefit portions of the river reaches at issue in the complaint."  *Id.*

"[T]he Corps has used river training structures along the [Middle Mississippi River], [Lower Mississippi River], and [Lower Ohio River] for well over 100 years."  *Id.* at 6.  These "structures redirect 'the river's energy to achieve a desired velocity and/or scour pattern to deepen or provide better alignment for the navigation channel.'"  *Id.* (citing ECF No. 14-1 ("Def.'s Ex. 1") at 5; Compl. ¶ 38).  As stated by the government, "[t]he intent and goal of those structures, 'as authorized by Congress, is to obtain and maintain a navigation channel and reduce federal expenditures by alleviating the amount of annual maintenance dredging through the construction of regulating works.'"  *Id.* (citing Def.'s Ex. 1 at ES-1, ES-5).

---

[1] In its motion, the government explains the history and function of these structures, *see generally* Motion at 6–7, and Plaintiffs state in their response that they do not object to the government's characterizations, Response at 2–3.

*Olmsted Locks and Dam Project*

"In 1988, Congress authorized construction of the Olmsted Locks and Dam project to replace Locks and Dams 52 and 53, which were originally constructed in the 1920s and were functioning beyond their design lives." *Id.* at 8 (citing ECF Nos. 14-21 ("Braden Decl.") ¶ 3 and 14-23 ("Ex. 23") at 1, 6). Like the aforementioned river training structures, construction of the dam was "intended to improve navigation along the Ohio River system." *Id.* "In 2004, the Corps awarded a contract for the construction for the actual dam, but construction effectively paused until 2010." *Id.* (citing Braden Decl. ¶ 3 and Ex. 23 at 7, n.20). The Olmsted Locks and Dam did not become operational until September 4, 2018. *Id.* at 11 (citing ECF No. 14-13 ("Lamkin Decl.") ¶ 3).

Notably, Plaintiffs allege that "[w]hile the dam was being constructed, hundreds of wing dikes downstream were constructed to maintain a channel below the dam and as recent as 2018 a new dike project to construct approximately fourteen large dikes just upstream and downstream of the dam was commissioned." Compl. ¶ 97. Additionally, Plaintiffs assert that "[u]pon its completion, the dam caused the river to rise over 13 feet from its previous pool." *Id.* ¶ 98. Plaintiffs also allege that "[a]ny structure constructed in a river generally causes a backwater effect, essentially raising the [water surface elevation] upstream of the structure . . . which raises the [water surface elevation] upstream of the dam," and "can be determined by hydraulic models that the Corps should have [commissioned]." *Id.* ¶ 104.[2]

*Plaintiffs' Theory of Liability*

Plaintiffs allege that the cumulative effect of the Corps' conduct has altered the "historical hydrograph" of the rivers, *id.* ¶ 7, leading to "atypical flooding"—which they define as the inundation of flood waters "with greater frequency and at unusual times of [the] year," *id.* ¶ 9. Specifically, Plaintiffs point to three actions by the Corps: 1) the construction of river training structures in the Mississippi and Ohio Rivers; 2) "dredging operations" conducted "to maintain a navigable river channel"; and 3) construction of the Olmsted Locks and Dam. *Id.* ¶¶ 3–4. Plaintiffs allege that due to "the Corps' increasingly aggressive manipulation of the Rivers," in conjunction with the gradual accumulation of sediment, which may have been "exacerbated" by a 2011 flood, "the historical hydrograph of the River has changed." *Id.* ¶¶ 7, 79–80. As a result, "Plaintiffs' property is now inundated with flood waters with greater frequency and at unusual times of year in a manner that deviates from historical flooding patterns"—denoted "atypical flooding"—that "would not otherwise have occurred." *Id.* ¶¶ 9, 121. According to Plaintiffs, "[t]o the extent that natural seasonal flooding has always occurred [on Plaintiffs' properties] in the absence of government action, it has been severely altered and has recently occurred successively outside of typical flooding seasons in 2013, 2015, 2018, 2019, and 2020." *Id.* ¶ 121.

---

[2] Plaintiffs further allege general assertions about the backwater effects of such structures on waster surface elevations. *See id.* ¶¶ 105–06 ("The areas at the Dams are often narrowed on each side of the Dam. This action causes constriction of the natural flow are and results in a backwater effect. Depending on the severity of the backwater effect, it may cause sediment deposition upstream of the structure and thus increasing the [water surface elevation], for the same flow.").

Furthermore, Plaintiffs allege that "[t]he flooding caused by the Corps' aggressive manipulation of the Rivers has disrupted and interfered with Plaintiffs' reasonable, investment-backed expectations for the intended and customary use of their land and other property, which has primarily been agriculture use." *Id.* ¶ 11. Accordingly, they claim that this damage "was the direct, natural, probable, and foreseeable result of the Corps' actions." *Id.* ¶ 124. Plaintiffs characterize these actions as the Corps taking "flowage easements over Plaintiffs' property" that have not been obtained either "through contract or direct condemnation, nor has the Corps offered Plaintiffs just compensation for the benefit that it has appropriated for public use." *Id.* ¶¶ 12, 126. In sum, Plaintiffs allege that the government, through the authorized conduct of the Corps, took their "property and flowage easements without just compensation in violation of the Fifth Amendment to the United States Constitution." *Id.* ¶ 14.

## DISCUSSION

It is clear from the government's motion to dismiss that it believes with some level of certitude that Plaintiffs' property has not been taken, and, therefore, the United States does not owe Plaintiffs just compensation. Although that certitude may prove correct at the appropriate stage in this litigation, at present, it appears to have caused the government to prematurely attempt to get to the merits of Plaintiffs' claims on an RCFC 12 motion. As will be more fully discussed below, in its motion to dismiss, the government—under the guise of timeliness and failure to state a claim—seems to focus more on whether Plaintiffs can prove that the government's action caused flooding rather than properly limiting their arguments to timeliness and whether Plaintiff has stated a valid legal claim. Whether Plaintiffs can prove that the government's actions caused a taking of their property is a question for another day. For purposes of the government's RCFC 12 motion the only question is whether there is a properly pled claim that falls within the Tucker Act's six-year statute of limitations. This question the Court easily answers in the affirmative.

**A.      Plaintiffs' Claims Were Brought Within the Statute of Limitations**

**1. Standard of review**

In considering an RCFC 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the Court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). Alternatively, if an RCFC 12(b)(1) motion "challeng[es] the factual basis for the court's subject matter jurisdiction," those factual allegations in the complaint are not controlling and only uncontroverted factual allegations are accepted as true. *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citations omitted). In resolving these disputed predicate jurisdictional facts, "a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings." *Id.* at 1584 (citations omitted). However, such review is limited to "relevant evidence" that "challenges the truth of the jurisdictional facts alleged in the complaint, . . . in order to resolve the factual dispute." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988).

4

Accordingly, jurisdictional facts that were stated in a complaint, yet left uncontroverted after an RCFC 12(b)(1) motion, are therefore controlling and shall be accepted as true by the Court. *See Shoshone Indian Tribe of Wind River Rsrv. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012); *accord Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014) (citing *Gibbs v. Buck*, 307 U.S. 66, 72 (1939) (noting that when reviewing a motion to dismiss for lack of subject-matter jurisdiction, the court accepts only uncontroverted factual allegations as true)). Only in instances in which jurisdictional facts are controverted may the Court "consider relevant evidence in order to resolve the factual dispute." *Reynolds*, 846 F.2d at 747; *accord Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991) (finding that a court may "inquire into jurisdictional facts" in ruling on a motion to dismiss under RCFC 12(b)(1)).

### 2. The government fails to put Plaintiffs' allegations of atypical flooding into controversy

For the purposes of the jurisdictional portion of the government's motion to dismiss, the Court must accept Plaintiffs' allegations of atypical and unseasonal flooding as true because the government failed to controvert them. In their complaint, the common allegation by all the Plaintiffs is "atypical and unseasonal flooding caused by government action." *See* Compl. ¶¶ 18–37. Plaintiffs define "atypical" flooding as property being "inundated with flood waters with greater frequency and at unusual times of [the] year in a manner that deviates from historical flooding patterns." *Id.* ¶ 9. It is clear that the "unusual" time of the year to which Plaintiffs refer is the growing season, as Plaintiffs explain that they "have lost crops during times they never have or have not been able to farm due to atypical flooding." *See Id.* ¶ 112.[3]

In its Motion, the government fails to put forth any evidence that controverts Plaintiffs' allegations of new, "atypical" flooding during the growing season. Rather, much to the Court's bewilderment, the government spent a large amount of energy providing evidentiary support for its assertion that "flooding has occurred regularly throughout the relevant portions of the [Middle Mississippi River], [Lower Mississippi River], and [Lower Ohio River] for many years." Motion at 23; *see also, e.g.*, ECF No. 14-22. Undoubtedly, it would have been easier to simply cite the complaint, in which Plaintiffs openly admit that their properties have "always been subject to flooding." Compl. ¶ 8. Ultimately, nowhere in its motion or the exhibits attached thereto does the government present evidence (and thus call jurisdictional facts into question) contrary to Plaintiffs' assertion that they have experienced new, "atypical" flooding during the growing season.[4]

---

[3] This is further specified in Plaintiffs' response to the government's motion to dismiss through the affidavits attached thereto, wherein multiple Plaintiffs identify the "growing season" as beginning in mid-July. *See* ECF No. 22-5 ¶ 9; ECF No. 22-11 ¶¶ 7–8; ECF No. 22-12 ¶¶ 10–11; ECF No. 22-14 ¶¶ 8–9.

[4] In fact, some of the evidence the government provides to support its motion actually weighs against it. For instance, one exhibit the government cites to supposedly "document the extensive flooding before July 30, 2015, in the counties where plaintiffs allegedly own property," does not include a single flood event during the growing season. Motion at 23 (citing ECF No. 14-22). The only "Historical Hazard" documented in the exhibit that may have occurred during the relevant seasonal period is (ironically) a drought dated August 2005. ECF No. 14-22 at 135.

At oral argument, the government attempted to clarify that—in its view—these static structures could not have altered the time of year that flooding occurred without increasing the water surface levels consistently throughout the entire year. *See* Oral Argument at 59:37 ("It simply cannot be that permanent structures are only causing flooding in July."). Therefore, the government sought to show that the historical water surface elevations in the areas where the Plaintiffs own property have not increased overall. However, this general claim is not sufficient to put in dispute the jurisdictional facts alleged by Plaintiff, which the Court must accept as true and draw all reasonable inferences in favor thereof. The government simply did not offer anything to controvert Plaintiffs' assertion that their property experienced "atypical" flooding during the growing season. Therefore, for purposes of this analysis, the Court must presume that Plaintiffs rarely—if ever—experienced flooding outside of the typical flooding season until 2013.

In their complaint, Plaintiffs directly assert that their properties experienced "atypical" and "recurrent" flooding which "would not otherwise have occurred" absent the Corps' actions. Compl. ¶ 121. Although Plaintiffs are quick to admit that "natural *seasonal* flooding has always occurred in the absence of government action," their claim for relief relies on the fact that the flooding pattern affecting their properties "has been severely altered." *Id.* (emphasis added). Plaintiffs provide allegations in support of this alteration by pointing to specific flooding events which "occurred successively outside of typical flooding seasons in 2013, 2015, 2018, 2019, and 2020." *Id.* The government's motion does not controvert these allegations; accordingly, the Court must accept them as true.

### 3. Judged in the light most favorable to Plaintiffs, the complaint states a claim within the statute of limitations

Plaintiffs base their claim to relief upon the Just Compensation Clause of the Fifth Amendment, which states that private property shall not be "taken" by the government "for public use, without just compensation." U.S. CONST. amend. V, cl. 4. Such a taking can be accomplished by "[a] wide spectrum of governmental action . . . ranging from the actual physical occupation of land to, in certain circumstances, the enactment of a regulation or statute." *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000). "Generally speaking, property may be taken by the invasion of water where subjected to intermittent, but inevitably recurring, inundation due to authorized Government action." *Barnes v. United States*, 210 Ct. Cl. 467, 474(1976) (citing *United States v. Cress*, 243 U.S. 316 (1917)). Courts are also in agreement that "the taking of a flowage easement without just compensation can constitute a violation of the Fifth Amendment." *Ark. Game & Fish Comm'n v. United States*, 87 Fed. Cl. 594, 616 (2009), *rev'd*, 637 F.3d 1366 (Fed. Cir. 2011), *rev'd and remanded*, 568 U.S. 23 (2012), and *aff'd*, 736 F.3d 1364 (Fed. Cir. 2013) ("*Ark. Game & Fish III*"); *see also Pumpelly v. Green Bay & Miss. Canal Co.*, 80 U.S. (13 Wall.) 166, 172 (1871) ("The backing of water so as to overflow the lands of an individual . . . if done under statutes authorizing it for the public benefit, is such a taking as by the constitutional provision demands compensation."); *United States v. Dickinson*, 331 U.S. 745, 748 (1947) ("Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time."); *Ridge Line v. United States*, 346 F.3d 1346,

1353 (Fed. Cir. 2003) ("[G]overnment actions may not impose upon a private landowner a flowage easement without just compensation.").

In instances in which property is taken and the government fails to compensate the owner, the Tucker Act, 28 U.S.C. § 1491, provides jurisdiction to enforce the owner's compensatory right. *See Preseault v. Interstate Comm. Comm'n*, 494 U.S. 1, 11–12 (1990). Claims for just compensation under the Tucker Act must be filed no more than six years after the date of accrual. *See* 28 U.S.C § 2501 (1994). In general, a just compensation claim accrues when "all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988). Thus, "the key date for accrual purposes is the date on which the plaintiff's land has been clearly and permanently taken." *Boling*, 220 F.3d at 1370. However, "in cases where the government leaves the taking of property to a gradual physical process, rather than utilizing the traditional condemnation procedure, determining the exact moment of claim accrual is difficult." *Id.*

To address the difficulty, the Supreme Court provided a framework for such cases in *Dickinson*, stating that "when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" 331 U.S. at 749. Prior to a taking, the government always has the option of "tak[ing] appropriate proceedings, to condemn [the property] as early as it cho[oses]." *Id.* Doing so would obviously "fix[] the time when the property was 'taken.'" *Id.* at 747. However, when the government decides to forego the opportunity to define precisely when a taking occurs, and instead "le[aves] the taking to physical events," it is "thereby putting on the owner the onus of determining the decisive moment . . . when the fact of taking could no longer be in controversy." *Id.* at 748. Recognizing that these circumstances would allow the government to place an unfair burden on the property owner, "the Court discouraged the strict application of accrual principles in cases where the taking is the result of a gradual process." *Boling*, 220 F.3d at 1370 (citing *Dickinson*, 331 U.S. at 748 ("The Fifth Amendment expresses a principle of fairness and not a technical rule of procedure enshrining old or new niceties regarding 'causes of action'—when they are born, whether they proliferate, and when they die.")).

This principle, commonly referred to as the "stabilization doctrine," has been continually applied since *Dickinson* to hold that "the statute of limitations d[oes] not bar an action under the Tucker Act for a taking by flooding when it [i]s uncertain at what stage in the flooding operation the land ha[s] become appropriated for public use." *United States v. Dow*, 357 U.S. 17, 27 (1958). Rather, "stabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." *Boling*, 220 F.3d at 1370–71. "Thus, during the time when it is uncertain whether the gradual process will result in a permanent taking, the plaintiff need not sue"; however, "once it is clear that the process has resulted in a permanent taking and the extent of the damage is reasonably foreseeable, the claim accrues and the statute of limitations begins to run." *Id.* at 1371; *accord Fallini v. United States*, 56 F.3d 1378, 1382 (Fed. Cir. 1995) (holding that a claim stabilizes when the "permanent nature" of the taking is evident); *Nadler Foundry & Mach. Co. v. United States*, 143 Ct. Cl. 92 (1958) (holding

7

that *Dickinson* does not entitle the plaintiff to wait until the damage is complete before filing suit). Finally, it should be noted that while the stabilization doctrine is limited to cases of a distinct nature, "these cases represent an application of general accrual principles, rather than a broad exception to them." *Boling*, 220 F.3d at 1371 (citing *Gustine Land & Cattle Co. v. United States*, 174 Ct. Cl. 556, 656 (1966) (recognizing that a broad interpretation of *Dickinson* would put it in "unending conflict with the statute of limitations")).

Plaintiffs filed their complaint on July 30, 2021. According to the government, Plaintiffs' claims are time-barred because Plaintiffs were, or should have been, aware that "all the events which fix the government's alleged liability had occurred" prior to July 30, 2015. Motion at 21–22. Although this would be a correct statement of law had Plaintiffs' claims accrued prior to July 30, 2015, the complaint alleges that atypical, unseasonal flooding did not stabilize, and thus accrue, until after 2015. *See* Response at 10–11 ("Plaintiffs' claims accrued only in 2019, once Plaintiffs had undergone multiple years of flooding that was uncharacteristic for their particular parcel in close succession."). As discussed above, the government did not challenge this jurisdictional fact; therefore, the Court will presume the allegations in the complaint on this point are true and that the alleged atypical, unseasonal flooding did not stabilize until some point in time after July 30, 2015.

It appears that the government's motion to dismiss is based on a misunderstanding of what Plaintiffs are claiming has been taken and, flowing from that misunderstanding, what events allegedly fix liability in this case. Under the government's theory, the three events which fix its liability are: 1) the Corps' construction of river training structures; 2) regular flooding in the areas where Plaintiffs' properties are located, which has been occurring for decades; and 3) publicly available knowledge of the theory that river training structures cause increased water surface elevations. *See* Motion at 21–31. The government claims that because Plaintiffs knew or should have known about the existence of these "events" before July 30, 2015, their claims accrued outside the six-year statute of limitations. *Id.* at 21–22.

However, even if the government's assertions are correct, they do not establish that the Plaintiffs' land was "clearly and permanently taken" prior to July 30, 2015. *Boling*, 220 F.3d at 1370. None of these events necessitate even an infringement of the property rights the Plaintiffs allege were taken, let alone "inroads" being made "to an extent that, as between private parties, a servitude has been acquired . . . in [the] course of time." *Dickinson*, 331 U.S. at 748. Rather, from the allegations in the complaint (and even the limited jurisdictional evidence at the Court's disposal), it seems clear that the moment of accrual for the alleged "atypical" flooding claimed by Plaintiffs would be when that flooding stabilized under *Dickinson* and its progeny.

Application of the stabilization doctrine to the accrual of similar takings claims is not uncommon in this Court and its predecessor. *See, e.g.*, *Barnes v. United States*, 210 Ct. Cl. 467 (1976). The plaintiffs in *Barnes* dealt with a similar, cyclical pattern of "occasional flooding" that would result from "seasonal high flows." *Id.* at 472. In *Barnes*, it was noted that typically "the then adequate channel carrying capacity could accommodate the additional volume in a relatively short period of time, and crops could be planted and harvested the same year without substantial difficulty." *Id.* Moreover, the Court of Claims observed that, prior to the alleged taking, the plaintiffs' property was "never subjected to sustained high flows during mid-August,

September, October, or November." *Id.*  However, in August and September of 1969, the *Barnes* plaintiffs experienced flooding that was atypical compared to their historical expectations.  *See id.* at 473.  Similar off-seasonal flooding occurred again in 1970, 1971, 1972, and 1973.  *Id.*  The *Barnes* court applied *Dickinson* and determined that "the date of taking here is not in our view the date of the first flood in 1969, but rather in 1973 after it first became clearly apparent by the passage of time that the intermittent flooding was of a permanent nature." *Id.* at 480.  The *Barnes* court also added that "[a]dopting a date of taking must often be done in a somewhat imprecise manner, this aspect of the cases being in the nature of a jury verdict." *Id.* "The date selected obviously depends on the facts of each case, but the facts here lead us to the firm conclusion that the date the Government completed taking its flowage easement cannot be prior to when, through passage of time, the permanent character of intermittent flooding could fairly be perceived." *Id.*

Similarly, here, Plaintiffs have plausibly alleged that their claims did not stabilize until after July 30, 2015.  In their complaint, Plaintiffs state that "[t]o the extent that natural seasonal flooding has always occurred in the absence of government action, it has been severely altered and has recently occurred successively outside of typical flooding seasons in 2013, 2015, 2018, 2019, and 2020."  Compl. ¶ 121.  Like the plaintiffs in *Barnes*, Plaintiffs' claims would not accrue until the flooding "became clearly apparent by the passage of time that the intermittent flooding was of a permanent nature."  210 Ct. Cl. at 480.  Although the Court cannot say for certain on which specific date Plaintiffs' claims did ultimately accrue, it is certain that the allegations of the complaint place the accrual date for unseasonal or atypical flooding at some point later than July 30, 2015, and that the government did not challenge *this* jurisdictional fact in its motion to dismiss.  Thus, the government's motion to dismiss on jurisdictional grounds must be denied.

**B.     Plaintiffs Plausibly Allege a Fifth Amendment Just Compensation Claim Sufficient to Survive the Government's Rule 12(b)(6) Motion**

**1.  Standard of review**

A complaint may be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  When considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint, and . . . must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted); *see also Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("In ruling on a 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff.").  However, in order to avoid dismissal, the complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing of entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  In other words, "[t]he factual allegations must be enough to raise a right to relief above the speculative level." *Bank of Guam v. United States*, 578 F.3d 1318, 2326 (Fed. Cir. 2009).

### 2. The government's three-part motion under RCFC 12(b)(6) is without merit

In sum, Plaintiffs' complaint alleges that

> [a]s a direct, natural, probable and foreseeable cumulative result of the Corps' increasingly aggressive manipulation of the Rivers, and the sedimentation process caused by the Corps' activities, and exacerbated by the 2011 flood, the historical hydrograph of the River has changed. . . . [And although] Plaintiffs' property has always been subject to flooding[,] . . . Plaintiffs' property is now inundated with flood waters with greater frequency and at unusual times of year in a manner that deviates from historical flooding patterns (collectively, "atypical flooding").

Compl. ¶¶ 7–9. Plaintiffs go on to claim that this flooding interferes with their reasonable, investment-backed expectation and that the "Corps has not obtained flowage easements . . . nor has the Corps offered Plaintiffs just compensation for the benefit that it has appropriated for public use." Compl. ¶¶ 11–12. Accordingly, Plaintiffs claim they are entitled to just compensation. *Id.* at 21. Conversely, for three separate reasons discussed below, the government asserts that Plaintiffs' complaint fails to state a claim upon which relief may be granted. *See* Motion at 36–45.

To determine whether there has been a taking of private property by the government for which just compensation is due, the Court employs a two-part test. *See Klamath Irr. Dist. v. United States*, 635 F.3d 505, 511 (Fed. Cir. 2011); *accord Palmyra Pac. Seafoods, L.L.C. v. United States,* 561 F.3d 1361, 1364 (Fed. Cir. 2009). First, the claimant must identify a cognizable property interest. *Klamath*, 635 F.3d at 511. Second, the Court must determine whether the government's action amounted to a compensable taking of that property interest. *Id.* In its motion to dismiss, the government offers three arguments as to why it does not believe Plaintiffs state a legally cognizable claim under the second prong of this test: 1) Plaintiffs failed to pinpoint a precise government action; 2) any government action that may have taken Plaintiffs' property occurred below the navigable servitude; and 3) the actions alleged amount to a tort, not a taking. The Court will address each in turn.

#### a. Pinpointing a precise government action

The government begins its attempt to have Plaintiffs' complaint dismissed under RCFC 12(b)(6) by asserting that "[P]laintiffs have failed to state a claim for which relief can be granted because the complaint does not pinpoint the precise action that constituted conduct the government could not engage in without paying compensation." Motion at 37 (internal quotations omitted). The government contends that "[i]nstead of identifying a specific government action at a particular (or even reasonably limited) time and place," Plaintiffs allege only "vaguely" that "the Corps' construction of river training structures and dredging to 'maintain a navigable river channel,' along with the construction of the Olmstead Locks and Dam has led to flooding." *Id.* (citing Compl. ¶¶ 1–9). In other words, the government asserts, the Plaintiffs "allege that *every* action related to maintaining a navigable channel in these rivers has led to a taking." *Id.* This "failure to pinpoint a specific government action," the government argues, "does not satisfy pleading requirements." *Id.* (citing *Branch v. United States*, 69 F.3d

1571, 1575 (Fed. Cir. 1995)).  Despite the bluster of its argument (including its suggestion that Plaintiffs should take their complaint to the "halls of Congress"), the government's argument roundly fails for at least two reasons.

  First, the *regulatory* takings "pinpointing" requirement the government cites to support its argument is inapplicable in this *physical* takings case.  Indeed, the Supreme Court has made clear that "it [is] inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 323 (2002).  It reiterated this point more recently, observing that its "cases have stressed the 'longstanding distinction' between government acquisitions of property and regulations." *Horne v. Dep't of Agric.*, 576 U.S. 350, 361 (2015) (quoting *Tahoe-Sierra*, 535 U.S. at 323).  What is more, even if the pinpointing principle the government attempts to rely upon here applied in this physical takings context, the government is misapplying the import of the rule in this case in which it is clear what property has been physically taken.  In making its argument, the government focuses on the use of the word "pinpoint" in two Federal Circuit cases in which the circuit analyzed the quality of a property owners' pinpointing of a government action.  However, in so focusing on the word "pinpoint" in the circuit's analysis, the government overlooks *why* the circuit was concerned with pinpointing in those regulatory takings cases: because the pinpointing of the government act was needed to "determine what was taken." *Branch*, 69 F.3d at 1575; *see also Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 855 (Fed. Cir. 2009) ("As the first step in our analysis, we must identify what, if anything, was the subject of the alleged taking.").  Here, however, in this alleged physical taking, it is clear what was allegedly taken.

  Second, even if the government was correct that some sort of pinpointing requirement applied here, Plaintiffs have sufficiently alleged their claims with enough specificity to "pinpoint" what government actions have allegedly led to the taking of their properties.  Plaintiffs here allege that multiple Corps' actions undertaken to maintain the navigable channel had the effect of causing atypical, unseasonal flooding on their properties.  Plaintiffs clearly allege that, but for these actions, their properties would not be subject to regular flooding during the growing season.  This case is not dissimilar to the allegations in *Ideker Farms*, in which Judge Firestone "analyzed multiple Corps actions" and concluded that "the plaintiffs did not have to pinpoint the specific Corps' action(s) that caused the flooding on their property." 136 Fed. Cl. 654, 674 (2018).  Instead, "[i]t was, as these plaintiffs would say, the 'combined and cumulative' impacts of the Corps' actions over time that constituted a taking." *Id.*  Nor is this case wholly different from the Federal Circuit's determination in *Arkansas Game & Fish III* that "[t]he government cannot obtain an exemption from takings liability on the ground that the series of interim deviations were adopted on a year-by-year basis, rather than as part of a single multi-year plan, when the deviations were designed to serve a single purpose and collectively caused repeated flooding and timber loss on the Commission's property."  736 F.3d at 1370.  In fact, the government even admits that the alleged government actions were all authorized and undertaken for the ultimate and single purpose "to obtain and maintain a navigation channel." Motion at 4.  Given the standard of review for a RCFC 12(b)(6) motion, it is clear to the Court that the complaint alleges sufficient facts to plausibly "pinpoint" the accrual date of their claims.

As alluded to above, this entire argument really appears to be yet a further attempt by the government to get to the merits of Plaintiffs' claims on a motion to dismiss. What it appears the government is arguing in this portion of its motion to dismiss is that the Court should dismiss Plaintiffs' complaint because it might be difficult for Plaintiffs to prove—at the appropriate phase of this litigation—that the government actions Plaintiffs allege in their complaint effected a taking, did in fact lead to a taking. That Plaintiffs point to a series of government actions over time in support of their just compensation claim does not mean that Plaintiffs fail to state a claim, it just means that proving their claim might be more difficult than if they could point to one isolated government action. But the degree of difficulty in proving one's case is not the standard for an RCFC 12(b)(6) dismissal.

### b. *Dominant navigable servitude*

Next, the government argues that Plaintiffs have not alleged sufficient facts to support a claim that the government's actions caused a taking of Plaintiffs' property because, according to the government, Plaintiffs do not allege that the flooding occurred outside the United States' navigable servitude. The government's argument, however, is plainly without merit and is contradicted by an exhibit the government itself offered in support of its RCFC 12(b)(1) motion, which shows that Plaintiffs' properties clearly do not sit in a riverbed. *See* ECF No. 15-8. The Court cannot tell whether the government's motion on this point is some sort of magic words gotcha game that is believes Plaintiffs' complaint does not meet, or an invitation to the Court to ignore controlling and indistinguishable Supreme Court, Court of Claims, and Federal Circuit precedent. Either way, on this point, the government's motion fails.

To the extent that the government is asserting that Plaintiffs must affirmatively and literally "plead that the alleged flooding falls outside of the United States' navigational servitude," Motion at 41—*i.e.*, that some set of magic words must be used to state a claim—it is an unreasonable contention. The government is essentially arguing that identifying the exact locations of their properties in the complaint, *see* Compl. Ex. 1, which clearly do not sit in the bed of either the Mississippi or Ohio Rivers, was insufficient. But giving the precise location of their respective properties accomplishes exactly what the government argues must be accomplished—it alleges that the "flooding falls outside of the United States' navigational servitude." Motion at 41. Lest there be any confusion that the government understood the location of Plaintiffs' properties (and that these locations were not in a river!), the Court need look no further than the government's own exhibit attached to this very motion. S*ee* ECF No. 15-8 (aerial photos overlayed with the locations of the parcels at issue showing the government was clearly aware that the parcels were not located within the navigable servitude). It is beyond peradventure that the government knows that Plaintiffs' properties are not located within the United States' navigable servitude.

And, to the extent that the government is arguing that it was precipitation and not government action that caused the alleged flooding on Plaintiffs' properties—because the government is not responsible for "non-governmental actions, especially natural phenomena, so long as the United States operates within the scope of its navigational servitude," *see* ECF No. 26 ("Gov. Reply") at 18—the government's argument beyond being illogical is foreclosed by Supreme Court, Court of Claims, and Federal Circuit precedent. Plaintiffs may, at the end of the

day, be unable to prove that the government's actions effected a taking, but the government's defense—that only precipitation (and never dams or other man-made structures) causes flooding—finds no support in the law or reason.  It simply does not matter that all of the structures that the government built that have allegedly effected a taking in this case sit at or below the navigable servitude.  What matters is where the effect of the flooding is felt.  Indeed, three courts whose precedents bind the undersigned have flatly rejected for *decades*, the government's navigable servitude argument in this case.

> First, the Supreme Court, in *United States v. Virginia Electric & Power Co.*, held that
>
> > [s]ince the privilege or servitude only encompasses the exercise of this federal power with respect to the stream itself and the lands beneath and within its high-water mark, *the Government must compensate for any taking of fast lands which results from the exercise of the power*.  This was the rationale of *United States v. Kansas City Life Ins. Co.*, 339 U.S. 799 [(1950)], where the Court held that when a navigable stream was raised by the Government to its ordinary high-water mark and maintained continuously at that level in the interest of navigation, *the Government was liable "for the effects of that change (in the water level) upon private property beyond the bed of the stream."*  339 U.S. at 800–01.

365 U.S. 624, 628 (1961) (emphasis added).  More recently, the Federal Circuit, citing to the Court of Claims, even more pointedly rejected the argument the government makes here:

> We also reject the offered view that no compensation can ever be owed for the consequential effects of construction activities to further navigation undertaken solely within the boundaries of a river bed subject to the navigational servitude.  In fact, the latter argument completely misses the mark.  In *Tri-State Materials Corp. v. United States*, 213 Ct. Cl. 1 (1977), this court's predecessor held that the government could not avoid liability on the basis of the navigational servitude where a dam built to enhance navigability on a river caused plaintiff's sand and gravel mine, which was located outside the bed of a navigable stream, to flood as the result of restricted subterranean drainage. As observed by the Court of Claims, *it is not the location of the cause of the damage that is relevant, but the location and permanence of the effect of the government action causing the damage that is the proper focus of the taking analysis*.  *Id.* at 4; *see also United States v. Cress*, 243 U.S. 316 (1917); *Goose Creek Hunting Club, Inc. v. United States*, 207 Ct. Cl. 323 (1975).

*Owen v. United States,* 851 F.2d 1404, 1411–12 (Fed. Cir. 1988) (emphasis added); *see also Ark. Game & Fish III*, 736 F.3d at 1371 (affirming a decision finding a taking via flowage easement in which government action simply contributed to a "substantial increase" of *otherwise naturally-recurring flooding*).

Simply put, the government's argument on this point is completely foreclosed by a plain reading of the complaint and long-standing, binding precedent.  To paraphrase the Federal Circuit, contrary to the government's argument on this point, it is not the location of the river

13

training other structures that is relevant, but the location and permanence of the effect of the government action causing the flooding that is the proper focus of the Court's focus.  Therefore, the government's motion to dismiss on this ground must be denied.

### 3.  Plaintiffs' claims are for just compensation and do not sound in tort

Lastly, the government claims that "Plaintiffs have also failed to state a compensable takings claim because their claims sound in tort, not takings law."  Motion at 42.  Citing *Ridge Line*, the government argues that Plaintiffs' claims sound in tort because they have failed to "prove" that "the government intend[ed] to invade a protected property interest" or that "the asserted invasion [wa]s the direct, natural, or probable result of an authorized activity and not an incidental or consequential injury."  *Id.* at 43 (citing 346 F.3d at 1355 (internal quotations omitted)).  In support of its argument, the government states that "[t]he Corps' explicit and widely known intention in building river training structures over the last two centuries, and the Olmsted Locks and Dam starting in 1993, was to maintain a navigable river channel as authorized by Congress," and not to "invade plaintiffs' protected property interests."  *Id.*  "Nor was the alleged taking of flowage easements across plaintiffs' properties the 'direct, natural, or probable results of' the Corp's construction of these structures," because the Corps' has "actively studied the impacts of the river training structures on stage levels since at least the 1930s and has published extensively why the river training structures do not impact flooding in any meaningful way."  *Id*. (citing *Ridge Line*, 346 F.3d at 1355).

Once again, the Court must point out to the government that this is a motion to dismiss for failure to state a claim—Plaintiffs do not have to "prove" the merits of anything at this point in the litigation, that is the purpose of summary judgment and/or trial.  Rather, as is discussed above, and is black letter law to which the government should be exceedingly familiar, the only requirement on Plaintiffs at this state in the litigation as far as RCFC 12(b)(6) is concerned is to allege facts that plausibly show they are entitled to relief for a taking.  *Bank of Guam*, 578 F.3d at 1326 ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts plausibly suggesting . . . a showing of entitlement to relief.") (internal quotation omitted).  And it should be clear to any reader of Plaintiffs' complaint that they have satisfied this standard.

The Federal Circuit established a two-part test to distinguish torts from takings in *Ridge Line*.  "First, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'"  *Ridge Line*, 346 F.3d at 1355 (quoting *Columbia Basin Orchard v. United States*, 132 Ct. Cl. 445, 450 (1955)).  "Second, the nature and magnitude of the government action must be considered."  *Id*. at 1356.  The government does not argue that Plaintiffs failed to meet the second prong of the *Ridge Line* standard; therefore, the Court's RCFC 12(b)(6) inquiry will focus on the first prong.[5]

---

[5] In a footnote in its reply brief, the government attempts to argue—without citation or quotation to its motion to dismiss—that it is in fact asserting that the second prong of the *Ridge Line* test is not met.  *See* Gov. Reply at 19 n.13.  The Court will not credit this phantom argument regarding the second prong that nowhere appears in the government's motion to dismiss.  *See, e.g.*, *Novosteel SA v. U.S., Bethlehem*

Accordingly, for purposes of this RCFC 12(b)(6) motion, Plaintiffs must have alleged facts plausibly suggesting they are entitled to relief either because (1) the Corps intended to take Plaintiffs' property interests by its actions to maintain a navigable river channel, or (2) the invasion of the Plaintiffs' property interests was the "direct, natural, or probable result" of the Corps' river maintenance actions. Here, Plaintiffs plainly acknowledge that the Corps did not intend to invade Plaintiffs' property interests. Rather, Plaintiffs allege—and do so rather clearly—that they can establish their takings claims by proving that the flooding they allege invaded their properties was the "direct, natural and probable result" of the Corps' actions to maintain a navigable river channel. *See* Compl. ¶¶ 7, 124; Response at 37–38.

In analyzing whether the invasion was the "direct, natural, or probable result" of the government action, the Court must look at whether the result was "predictable." *Id.* In other words, "the injury must be the foreseeable result of the action." *In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 248 (2019) (citing *Caquelin v. United States*, 140 Fed. Cl. 564, 576 n.18 (2018), *aff'd*, 959 F.3d 1360 (Fed. Cir. 2020) (internal citations omitted)). What is more, courts have held that "foreseeability is judged on an *objective* basis" and thus "subjective foresight of injury is not required." *Ideker*, 136 Fed. Cl. at 678 (emphasis added) (citing *Moden v. United States*, 404 F.3d 1335, 1344 n.3 (Fed. Cir. 2005) ("[F]oreseeability is an objective standard. Subjective foresight of injury is not required.")). Thus, arguments regarding the Corps' subjective foresight—like asserting that the Corps has "actively studied the impacts of the river training structures [and concluded that] . . . training structures do not impact flooding in any meaningful way"—do not somehow foreclose Plaintiffs' claims for purposes of an RCFC 12(b)(6) motion. Motion at 44.

With these principles in mind, it is clear to the Court that there is no plausible reading of the complaint that would suggest Plaintiffs are stating a claim that sounds in tort. Indeed, Plaintiffs repeatedly allege both directly and indirectly that the flooding they believe was caused by the Corps' actions was the direct, natural, or probable result of those actions, *see, e.g.*, Compl. ¶¶ 7, 10, 45 119, 123, 124, and these allegations all appear facially plausible. This is likely why the government does not even bother to argue that Plaintiffs' claims were insufficiently pled. Instead, the government first makes an irrelevant argument regarding an allegation that nowhere appears in the complaint, arguing that "Plaintiffs' claims should fail because of the publicly-recorded intent and purpose of the river training structures." Gov. Reply at 19. This might be a colorable argument in response to an allegation that the Corps *intentionally* flooded Plaintiffs' properties. However, no such allegation was pled by Plaintiffs.

And second, the government, once again ignoring that this is a motion under RCFC 12(b)(6), argues, with exhibits no less, that as a matter of fact "the magnitude of the alleged government interference is zero because river training structures do not cause atypical flooding to plaintiffs' properties." *Id.* at 19 n.13. But that is the very point of this litigation: to determine whether Plaintiffs' allegation that river training structures cause flooding is correct and, if so, whether they did in fact cause atypical, seasonal flooding of Plaintiffs' properties. That is not a

---

*Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").

question, as the government should be well aware, that can be answered on an RCFC 12(b)(6) motion.  To approach the government's argument with humor, rather than exasperation, it would appear, to paraphrase Judge Chamberlain Haller, that the government wants to skip the discovery process, go directly to trial, skip that, and get a dismissal.  MY COUSIN VINNY (Twentieth Century Fox Home Entertainment 1992).  Unfortunately for the government, however, the Court is not about to revamp the entire judicial process just because the government finds itself in the unique position of defending an agency that says it did not take private property without providing just compensation.  *Id.*  Accordingly, the government's motion to dismiss on this ground is denied.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** the government's motion to dismiss Plaintiffs' complaint pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction and RCFC 12(b)(6) for failure to state a claim.

In addition, within **twenty-one days** of the issuance of this opinion, Plaintiffs **SHALL FILE** an amended complaint.  The amended complaint shall specify with more temporal particularity (*e.g.*, which months of the year) the precise meaning of the term "atypical flooding" as used in the complaint, in addition to any other amendments Plaintiffs may seek to make.  The government's deadline to answer Plaintiffs' original complaint, *see* RCFC 12(a)(4), shall be suspended, and its answer, and deadline to answer, shall be to the amended complaint pursuant to RCFC 15(a)(3).

**IT IS SO ORDERED.**

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge
