# In the United States Court of Federal Claims

No. 21-1641 L
(Filed: October 30, 2024)

```
* * * * * * * * * * * * * * * * *    *
                                     *
GARY ANGELLY, et al.,                *
                                     *
              Plaintiffs,            *
                                     *
       v.                            *
                                     *
THE UNITED STATES,                   *
                                     *
              Defendant.             *
                                     *
  * * * * * * * * * * * * * * * *    *
```

*Jamie A. Robinson*, The Bruno Firm, LLC, argued the motion for Plaintiffs, *Ethan A. Flint*,[1] Flint Law Firm, LLC, counsel of record, of Edwardsville, IL, for Plaintiffs.

*Laura W. Duncan,* Natural Resources Section, Environment and Natural Resources Division, U.S. Department of Justice, of Galveston, TX, with whom were *Edward C. Thomas*, *Dustin J. Weisman*, *Mark Pacella*, and *Paul Freeborne*, of Washington, DC, for Defendant.

---

[1] As explained in more detail in this Court's show cause order, ECF No. 45, Plaintiff's attorney of record, Ethan A. Flint, did not attend either of the two oral arguments in this case. The Court found this particularly troubling during the second oral argument because Mr. Flint sent lawyers who did not work at his firm and whose names did not appear on any filings in the case to argue on behalf of his clients. *Id.* at 1. It is an elementary principle of practice before this Court that a party's attorney of record must appear at oral argument for that party's case unless, at the very least, he or she gives notice to the Court before the argument explaining his or her inability to appear and the Court permits another attorney to argue in the attorney of record's place. *See* RCFC 83.1(c)(1)–(2) (limiting a party to "have only one attorney of record in a case at any one time," and further mandating that "[a]ll filings must be signed in the attorney of record's name"); *see also* RCFC 11(b). Mr. Flint provided no such notice, and the Court stated that it would hold him in contempt unless he provided an explanation for his actions. ECF No. 45 at 2. Mr. Flint subsequently defended his actions by stating that he had "planned to attend the first oral argument on the Government's motion to dismiss but was unable to due to inclement weather," and that he "did not attend the second oral argument because [he] was unaware of [the] Court's practice of requiring Counsel of Record to attend every oral argument." ECF No. 46 at 1. He also produced evidence indicating that the private plane he chartered to fly from Miami to the first oral argument had been detained by a hurricane. ECF No. 46-3. Given this explanation, the Court will not sanction Mr. Flint for his unexcused failure to appear at oral argument.

## <u>OPINION AND ORDER</u>

**SOMERS**, Judge.

"[T]his was a plain case of 'put up, or shut up.' [Plaintiffs] were [un]wise and did the latter." Mark Twain, A Connecticut Yankee in King Arthur's Court 512 (New York, Charles L. Webster & Co. 1889). Establishing subject matter jurisdiction is a burden that rests with a plaintiff. Although generally it is established by making sufficient jurisdictional allegations in a complaint, when those jurisdictional allegations are challenged by the opposing side, more is required. Here, however, rather than coming forward with evidence sufficient to establish jurisdiction, Plaintiffs instead sat on their hands and said they would produce that required evidence another day. Or, in Mark Twain's words, they "shut up." The problem for Plaintiffs is that standing pat in light of the government's evidence controverting the complaint's jurisdictional facts was not an option. Rather, Plaintiffs were required to move beyond the allegations of their complaint and produce evidence in support of their jurisdictional claims regarding how their claims fell within the applicable statute of limitations. They failed to do so, and their complaint must be dismissed.

## BACKGROUND

The Court's opinion denying the government's first motion to dismiss contains much of this case's factual background. The Court repeats only those facts that are relevant here. Plaintiffs include Gary Angelly and other farmers, residents, and hunters who own or operate on land in Kentucky and Illinois within reach of the Mississippi or Ohio Rivers. ECF No. 32 ¶¶ 16–36. In their complaint, Plaintiffs state that their properties have historically experienced regular, seasonal flooding in the winter and spring months. *See, e.g.*, *id.* ¶ 8 ("Most of Plaintiffs' property has always been subject to flooding, and in many instances that flooding is what made the land valuable for its intended purposes."). In fact, in response to the government's original motion to dismiss, Plaintiffs asserted that "[f]looding in the winter and spring," has occurred regularly for as long as Plaintiffs have owned, or operated on, the properties at issue. ECF Nos. 22 & 23 at 11, 14, 15, 16, 23; *see also* ECF No. 22-2 ¶ 9. This regular winter and spring flooding does not interfere with Plaintiffs' ability to farm or otherwise cultivate their land because the waters recede in time for the farmer Plaintiffs to plant their crops. *See, e.g.*, ECF No. 32 ¶ 8; ECF No. 22-12 ¶¶ 10–11 (Plaintiff declaring that "[s]pring flooding does not prevent me from planting a crop," and "[a]s long as the ground is dry by July 15, I am able to plant a crop"). Plaintiffs allege, however, that their "properties are now inundated with flood waters to a greater extent, duration[,] and frequency, notably extending into the month of July, in a manner that deviates from historical flooding patterns (collectively, 'Atypical Flooding')." ECF No. 32 ¶ 9. According to Plaintiffs, this alleged new pattern of flooding is a result of the United States Army Corps of Engineers' ("Corps") management of the Ohio and Mississippi Rivers for navigational purposes, which has "over the course of time . . . increased the duration, frequency[,] and extent of flooding in the region and on Plaintiffs' properties." *Id.* ¶ 6.

## A.    Plaintiffs' Theory of Liability in Both Complaints

Plaintiffs' complaints both allege the same theory of harm.  Both assert that the cumulative effect of the Corps' conduct has altered the "historical hydrograph" of the rivers, leading to "atypical flooding." *Id.* ¶¶ 7, 9; ECF No. 1 ¶¶ 7, 9.  They defined atypical flooding as flood waters of "greater frequency and at unusual times of [the] year," ECF No. 1 ¶ 9, in their original complaint and, in their amended complaint, as flooding of "a greater extent, duration[,] and frequency, notably extending into the month of July, in a manner that deviates from historical flooding patterns," ECF No. 32 ¶ 9.  Plaintiffs point to three actions by the Corps to allege causation: (1) the construction of river training structures in the Mississippi and Ohio Rivers; (2) the "dredging operations" conducted "to maintain a navigable river channel"; and (3) the construction of the Olmsted Locks and Dam.  *Id.* ¶¶ 3–4.  Plaintiffs allege that, due to "the Corps' increasingly aggressive manipulation of the Rivers," in conjunction with the gradual accumulation of sediment that was "exacerbated" by a 2011 flood, "the historical hydrograph of the Rivers has changed." *Id.* ¶ 7.  According to Plaintiffs, "[t]o the extent that natural seasonal flooding has always occurred [on their properties] in the absence of government action, it has been severely altered and has recently occurred successively outside of typical flooding seasons, notably in July in 2013, 2015, and 2019." *Id.* ¶ 120.

Plaintiffs allege that "[t]he flooding caused by the Corps' aggressive manipulation of the Rivers has disrupted and interfered with Plaintiffs' reasonable, investment-backed expectations for the intended and customary use of their land and other property, which has primarily been agricultural." *Id.* ¶ 11.  They claim, accordingly, that this damage "was the direct, natural, probable, and foreseeable result of the Corps' actions." *Id.* ¶ 123.  Plaintiffs characterize these actions as the Corps taking "flowage easements over Plaintiffs' property," *id.* ¶ 125, that have not been obtained either "through contract or direct condemnation" and that were created without the "Corps offer[ing] Plaintiffs just compensation for the benefit that it has appropriated for public use," *id.* ¶ 12.  In short, Plaintiffs allege a violation of the Fifth Amendment to the United States Constitution.  *Id.* ¶ 14.

## B.    The Government's First Motion to Dismiss

Plaintiffs filed their complaint in this Court on July 30, 2021.  ECF No. 1.  The government responded with a motion to dismiss on December 3, 2021.  ECF No. 14.  The Court granted a lengthened submission date to allow the government more time to produce evidence to counter Plaintiffs' allegations.  ECF No. 6 at 1; ECF No. 7.  After a full round of briefing and oral argument, ECF Nos. 22–23, 26–27, the Court denied the government's motion to dismiss, *Angelly v. United States*, 165 Fed. Cl. 437 (2023).

The Court refused to dismiss Plaintiffs' case because the government's motion to dismiss failed to controvert Plaintiffs' jurisdictional facts.  As the Court explained, "the government . . . seem[ed] to focus more on whether Plaintiffs [could] prove that the government's action caused flooding rather than properly limiting their arguments to timeliness and whether Plaintiffs [had] stated a valid legal claim." *Angelly*, 165 Fed. Cl. at 442.  Responding to Plaintiffs' argument that a new pattern of flooding emerged recently, the government stated only that "flooding [had] occurred regularly throughout the relevant portions of the [Middle Mississippi River], [Lower

Mississippi River], and [Lower Ohio River] for many years." ECF No. 14 at 23. Making this obvious factual statement and producing the evidence to support it was unnecessary because, as the opinion pointed out, "it would have been easier to simply cite the complaint, in which Plaintiffs openly admit[ted] that their properties ha[d] 'always been subject to flooding.'" *Angelly*, 165 Fed. Cl. at 443–44 (quoting ECF No. 1 ¶ 8). In other words, proving that Plaintiffs' properties regularly flooded did not controvert Plaintiffs' jurisdictional allegation that a new flooding pattern stabilized within the statute of limitations. Therefore, because the Court had to assume that the uncontroverted facts in Plaintiffs' original complaint were true for the purposes of the government's motion to dismiss for lack of subject matter jurisdiction, the Court denied the government's motion on this ground. *Id.* at 452.[2]

In denying the government's motion to dismiss, however, the Court recognized that Plaintiffs' complaint suffered from a notable defect. Although the Court found that Plaintiffs' complaint's definition of atypical flooding was sufficient to survive the government's then-current motion to dismiss, it ordered Plaintiffs to file "an amended complaint. . . . [which] specif[ied] with more temporal particularity (*e.g.*, which months of the year) the precise meaning of the term 'atypical flooding' as used in the [original] complaint." *Id.* at 452–53.

## C.    Subsequent Filings

Plaintiffs amended their complaint on June 15, 2023, emphasizing that atypical flooding meant flooding of "a greater extent, duration[,] and frequency, notably extending into the month of July, in a manner that deviates from historical flooding patterns," ECF No. 32 ¶ 9, which resulted in "most of the Plaintiffs' properties flood[ing] unseasonably in the month of July in 2013, 2015, and 2019," *id.* ¶ 109. This description was seemingly consistent with Plaintiffs' representations at oral argument on the first motion to dismiss that their just compensation claims were solely for flooding during July. ECF No. 34, Oral Arg. at 64:14–21, 65:24–66:1 69:4–9. The government responded with another motion to dismiss on July 17, 2023. ECF No. 35. Unlike the previous motion to dismiss, this motion sought dismissal only under RCFC 12(b)(1) for lack of subject matter jurisdiction. *Id.* at 3. The government also produced hydrological data on historical flooding patterns that challenged Plaintiffs' assertion that flooding "extending into the month of July" was novel. *Id.* at 14–35. Moreover, it suggested jurisdictional discovery if the Court remained unclear whether a new flooding pattern had emerged. *Id.* at 40.

Plaintiffs opposed this latter suggestion in their response and argued that "there [was] no factual jurisdictional issue in dispute that must be resolved before this Court can either grant or deny the Government's motion . . . [because] the Government has all of the necessary gage data, public information[,] and Plaintiffs' statements to support its motion." ECF No. 40 at 36. Plaintiffs' response produced no new evidence to contradict the government's historical gage data," but contended that, for example, "the Government's own data demonstrates that Mr. Angelly experienced three years of July flooding within the decade of the 2010s, a pattern which had never before been seen on his property." *Id.* at 20. They also reattached the affidavits of each Plaintiff from their first complaint to illustrate that a new pattern of flooding had indeed developed, ECF No. 40-1, cited the government's own gage data, ECF No. 40-2, and produced a

---

[2] The Court also denied the government's motion to dismiss under RCFC 12(b)(6) for reasons explained in its original opinion in this case. *See Angelly*, 165 Fed. Cl. at 447–52.

transcript of a deposition from Dr. Robert R. Holmes, Jr., ECF No. 40-3, that was taken in an indirectly related case.[3]

The government replied on November 7, 2023, ECF No. 43, and the Court held oral argument on February 27, 2024, ECF No. 44. A new counsel for Plaintiffs, whose name appeared on none of the filings in this case, stated at this oral argument that Plaintiffs' claims were not limited to July, ECF No. 48, Oral Arg. at 45:18–23; 46:7–8; 55:12–13, and that the government's data in its motion to dismiss from the United States Department of Agriculture (USDA) regarding the timing of the growing season, which ostensibly defined the temporal reach of Plaintiffs' takings claim, was "stale," *id.* at 63:18. Disturbed that the attorney of record who signed both complaints and each of the briefs Plaintiffs submitted was not present at oral argument on either of the government's motions to dismiss, the Court ordered Plaintiffs' attorney of record to show cause as to why he should not be sanctioned. ECF No. 45.

## DISCUSSION

### A.    Legal Standard

Subject matter jurisdiction is the most fundamental of requirements the Court must evaluate in hearing a complaint, as "[w]ithout jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. 506, 514 (1868); *accord James v. United States*, 86 Fed. Cl. 391, 394 (2009) ("The condition precedent to all litigation is subject matter jurisdiction . . . ."). Accordingly, RCFC 12(h)(3) provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." A plaintiff bears the burden to prove at the outset of its case that the Court possesses subject matter jurisdiction by a preponderance of the evidence. *K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1004 (Fed. Cir. 2015) ("A plaintiff 'bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.'" (quoting *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988))); *accord Ideker Farms, Inc. v. United States*, 71 F.4th 964, 975 (Fed. Cir. 2023) ("Plaintiffs bear the burden of establishing subject-matter jurisdiction.").

Although "[i]n deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all uncontroverted factual allegations in the complaint[] and construes them in the light most favorable to the plaintiff," *Estes Exp. Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014), the Court does not give the plaintiff such deference for controverted facts relevant to subject matter jurisdiction. In such situations,

> [t]he government's factual challenge to the court's jurisdiction place[s] the burden on [the plaintiff] to demonstrate facts sufficient to support its contention regarding the court's jurisdiction. Once challenged, allegations alone are insufficient to meet the complainant's burden. Thus, [the Court] must scrutinize the evidence submitted by [the plaintiff] as support for its otherwise naked jurisdictional allegations in order to determine whether [the] case is indeed ripe for adjudication.

---

[3] *Riverview Farms v. United States*, 172 Fed. Cl. 672 (2024).

*Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993) (citations omitted); *see also Reynolds*, 846 F.2d at 748 (agreeing with the government's contention that "once the district court's subject matter jurisdiction was put in question it was incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction. . . . by a preponderance of the evidence."); *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) ("When . . . a defendant challenges the existence of subject matter jurisdiction in fact, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence."). In other words, "the court usually assumes all factual allegations in the complaint are true and draws all reasonable inferences in the plaintiffs' favor," but "a plaintiff cannot rely solely upon allegations in the complaint if the defendant or the court questions jurisdiction. Instead, the plaintiff must bring forth relevant, adequate proof to establish jurisdiction," and "[t]he court may examine relevant evidence in order to decide any [such] factual disputes." *Fairholme Funds, Inc. v. United States*, 114 Fed. Cl. 718, 720 (2014).

Jurisdictional facts are the "fact[s] that must exist for a court to properly exercise its jurisdiction over a case, party, or thing." *Jurisdictional Fact*, Black's Law Dictionary (12th ed. 2024). While the definition of jurisdictional facts is necessarily somewhat circular, their function is plain: the Court must be satisfied that the stated events that predicate the Court's subject matter jurisdiction over plaintiff's claim happened as the plaintiff described. *See The George Fam. Tr. ex rel. George v. United States*, 91 Fed. Cl. 177, 190 (2009) ("[W]hen the RCFC 12(b)(1) motion controverts the plaintiff's jurisdictional allegations and challenges the factual basis of the court's jurisdiction, the plaintiff must demonstrate facts sufficient to support jurisdiction. In assessing a plaintiff's proof, the court will not be limited to the allegations of the complaint, but instead 'may consider [other] relevant evidence in order to resolve the factual dispute.'" (second alteration in original) (citations omitted)). If, for example, the government challenges when events relevant to the plaintiff's claim occurred because they fall outside a cause of action's statute of limitations, the Court must find that they occurred within the relevant time period to proceed with the case. *See, e.g., United States v. Dickinson*, 331 U.S. 745, 749 (1947) (finding a takings claim for flooding was within the subject matter jurisdiction of the Court because the flooding occurred within the relevant six year statute of limitations despite the government challenging when the relevant flooding actually occurred); *Jackson-Greenly Farm, Inc. v. United States*, 144 Fed. Cl. 610, 625–26 (2019) (finding that similar relevant flooding upon which the plaintiffs premised a takings claim occurred outside the statute of limitations despite the plaintiffs' claims to the contrary). In so deciding, the Court's limited role is to scrutinize the evidence presented by both parties with respect to only those alleged facts necessary for subject matter jurisdiction of the plaintiff's overall claim. *George*, 91 Fed. Cl. at 189–90.

## B.    Analysis

Resolution of the government's motion to dismiss involves an examination of Plaintiffs' jurisdictional burden and whether they met it. In response to the Court's ruling on the government's first motion to dismiss for lack of subject matter jurisdiction, Plaintiffs were required to file an amended complaint that stated with more temporal particularity during which month(s) of the year their alleged pattern of unseasonal flooding occurred. Filing this amended

complaint with the requisite specificity about the timing of the alleged new pattern of atypical flooding was required to essentially close the jurisdictional loop on the questions raised by the government's first motion to dismiss and allow this case to proceed.  Plaintiffs filed an amended complaint, and the government renewed its motion to dismiss.  Unlike the government's first motion to dismiss, this second motion to dismiss called relevant jurisdictional facts into question with the government producing evidence that controverted Plaintiffs' allegations that a new, atypical flooding pattern had emerged within the statute limitations.  With these jurisdictional facts controverted, Plaintiffs' obligation went beyond simply alleging that government action within the statute of limitations effected a taking; now Plaintiffs were required to prove that a pattern of atypical flooding emerged within the statute of limitations by a preponderance of the evidence.  Plaintiffs failed to meet either their obligation to meaningfully amend their complaint to put the government on sufficient notice regarding the parameters of the alleged new pattern of atypical flooding or to prove by preponderant evidence that the alleged new pattern emerged within the statute of limitations.

### 1.    Plaintiffs Failed to Meaningfully Amend Their Complaint as Required by the Court's Prior Opinion in this Case

As part of the Court's ruling on the government's first motion to dismiss, the Court required Plaintiffs to file an amended complaint stating with more temporal particularity what they meant by the term "atypical flooding" as used in their original complaint.  *Angelly*, 165 Fed. Cl. at 452–53 ("The amended complaint shall specify with more temporal particularity (*e.g.*, which months of the year) the precise meaning of the term 'atypical flooding' as used in the complaint, in addition to any other amendments Plaintiffs may seek to make.").  The Court required Plaintiffs to file an amended complaint in order to better define the metes and bounds of Plaintiffs' claims regarding atypical flooding and thus provide the government with the required notice regarding the nature of Plaintiffs' just compensation claim.  The statements in the original complaint regarding when during the year the alleged "atypical" or "unseasonal" flooding occurred or was occurring were too vague to put the government on notice as to what pattern of flooding was being alleged.  Stated differently, it was not enough for Plaintiffs to allege in their original complaint that their properties are "now inundated with flood waters with greater frequency and at unusual times of year in a manner that deviates from historical flooding patterns (collectively, 'atypical flooding')."  ECF No. 1 ¶ 9.  This allegation begs the question of what constitutes an "unusual time[] of year" or what are the "historical flooding patterns" according to Plaintiffs.  Plaintiffs' allegation that "most of Plaintiffs [sic] properties flooded unseasonably in 2013, 2015, 2018, 2019, and 2020," *id.* ¶ 110, or that flooding "has recently occurred successively outside of typical flooding seasons in 2013, 2015, 2018, 2019, and 2020," *id.* ¶ 121, are no more helpful without additional context.  Nor are the statements that each individual plaintiff was "deprived of the use and enjoyment of [their] land, listed in Exhibit A, due to atypical and unseasonal flooding caused by Government action," *id.* ¶¶ 18–37, or that "Plaintiffs have lost crops during times they never have or have not been able to farm due to the atypical flooding," ECF No. 1 ¶ 112.  Accordingly, the Court required Plaintiffs to file an amended complaint fleshing out Plaintiffs' definition of "atypical flooding."

The Court's hope was that the amended complaint would actually put the government on notice as to the alleged new pattern of flooding and would, if a second motion to dismiss were

filed, allow the Court to better assess whether Plaintiffs' just compensation claims fall within the applicable six-year statute of limitations. While the Fifth Amendment's Just Compensation Clause provides that "private property [shall not] be taken for public use, without just compensation," U.S. Const. amend. V, the Tucker Act's six-year statute of limitations limits a plaintiff's ability to get that compensation, 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). For physical takings, this usually means that "the events giving rise to the Government's alleged liability [must] have occurred and the claimant is or should be aware of their existence" within six years prior to the plaintiff filing his or her complaint. *Mildenberger v. United States*, 643 F.3d 938, 945 (Fed. Cir. 2011) (citing *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988). However, for a physical taking that involves a continuous process rather than a single event, the statute of limitations does not begin to run until the continuous process "has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the damage is foreseeable." *Boling v. United States*, 220 F.3d 1365, 1372 (Fed. Cir. 2000). This latter method of meeting the Tucker Act's six-year statute of limitations is referred to as the stabilization doctrine, and it is the theory by which Plaintiffs assert their claims are timely.

In their amended complaint, Plaintiffs alleged that their claims stabilized within the statute of limitations in two ways. Sixteen of the twenty plaintiffs allege that "[i]n 2019, a new pattern of flooding became apparent, which consistently . . . extended flooding into the month of July." ECF No. 32 ¶¶ 17–20, 22–24, 26–27, 29–30, 32–36. These sixteen plaintiffs also allege that in addition to being "atypical," the alleged new pattern of flooding is "unseasonal." *Id.* In addition, of these sixteen plaintiffs that allege flooding extending into July, six (all farmers) state that the flooding occurred during "peak farming season." *Id.* ¶¶ 17–20, 22–23. The remaining four plaintiffs state that "[i]n 2019, a new pattern of flooding became apparent when three flooding events in a single decade" occurred on their properties. *Id.* ¶¶ 21, 25, 28, 31.[4] These descriptions in the amended complaint regarding when Plaintiffs' claims stabilized are very similar to those in the Plaintiffs' original complaint. *Compare* ECF No. 32 ¶¶ 17–36, *with* ECF No. 1 ¶¶ 18–37. The only difference is the presence of the monthly descriptor "July" in sixteen sets of plaintiffs' allegations and a more explicit reference to a new "pattern of flooding." These descriptions do not, however, tell the Court or the government in which months this new pattern of flooding occurred (only that it *extends* into July), what this new pattern of flooding consists of, or from what evidence they divined that there was a new pattern besides their own perceptions.[5]

---

[4] The language in these pleadings varies somewhat. Plaintiff SRH LLC's claim states, for example, that "[i]n 2019, a new pattern of flooding became apparent when, for the first time, a building on the SRH property which had never previously flooded, flooded twice in a single decade, impairing the value of the property." *Id.* ¶ 31.

[5] The amended complaint also does not state explicitly that Plaintiffs could not have noticed the change in flooding patterns before 2019, only that "[i]n 2019, a new pattern of flooding became apparent." ECF No. 32 ¶ 17. Subjective knowledge is not the relevant inquiry under the stabilization doctrine; the test is whether a reasonable person would have been aware that the continuous flooding process stabilized into a permanent taking. *Banks v. United States*, 76 Fed. Cl. 686, 696 (2007). As the Plaintiffs' complaint is unclear on this point and the Court finds that Plaintiffs failed to allege a flooding pattern by preponderant evidence, no further analysis on this ambiguity is necessary.

Moreover, even though four sets of Plaintiffs do not claim any July flooding whatsoever, the amended complaint defines atypical flooding as Plaintiffs' properties being "inundated with flood waters to a greater extent, duration[,] and frequency, notably extending into the month of July, in a manner that deviates from historical flooding patterns (collectively, 'Atypical Flooding')." ECF No. 32 ¶ 9. This definition of atypical flooding essentially swaps the original complaint's ambiguous phrase "at unusual times of year" for the slightly less ambiguous descriptor "extending into the month of July." *Compare* ECF No. 1 ¶ 9, *with* ECF No. 32 ¶ 9.

These deficiencies were not an issue in deciding the motion to dismiss the original complaint because of the evidence that the government produced in support of its motion. As the Court observed, "[t]he government simply did not offer anything to controvert Plaintiffs' assertion that their property experienced 'atypical' flooding during the growing season. Therefore, for purposes of [the] analysis, the Court [had to] presume that Plaintiffs rarely—if ever—experienced flooding outside of the typical flooding season until 2013." *Angelly*, 165 Fed. Cl. at 444. Although the flaws in Plaintiffs' original complaint remain in large part in their amended complaint, they are more notable here because the government has now produced evidence that directly controverts Plaintiff's assertion that there is a new pattern of atypical flooding. *See, e.g.*, ECF No. 35-10. The Court cannot presume, therefore, that Plaintiffs' assertion that there is a new pattern of atypical flooding is true; rather, it must weigh the evidence presented by both parties to discern if Plaintiffs have produced evidence sufficient to suggest that a new pattern of flooding emerged or stabilized within the statute of limitations.

Determining the answer to that question is difficult because Plaintiffs failed to specify with any useful description or language what the new pattern of "atypical," or in some instances "unseasonal," flooding consists of. The Court gleans only two temporal features from Plaintiffs' amended complaint: that some of the takings involve flooding that "extend[s] . . . into the month of July" and that some of the takings occurred during the "peak farming season." *See, e.g.*, ECF No. 32 ¶ 17. The complaint does not make clear whether the "unseasonal" nature of the flooding claimed by sixteen sets of plaintiffs refers to the peak farming season mentioned by six Plaintiffs, the seasons of the year, or some other seasons, because the complaint gives a definition of neither the farming season nor the peak farming season, nor what makes the flooding unseasonal. Indeed, the amended complaint offers both the farming season and the colloquial use of "season" as possibilities. *Compare id.* ¶ 23 (claiming that Plaintiff Julian Harris's property experienced "unseasonal and Atypical Flooding during the peak farming season caused by Government action."), *with id.* ¶ 26 (claiming that Plaintiff Front Farm Hunting Club, LLC experienced "unseasonal and Atypical Flooding caused by Government action," but not specifying whether that referred to the growing season of the farming Plaintiffs). The Court also cannot infer when the unseasonal flooding is by comparing it to the "historical flooding patterns" that Plaintiffs admit occur in their amended complaint because they also failed to define more precisely what those historical flooding patterns are. *Id.* ¶ 9. In other words, Plaintiffs neither defined what the "historical flooding pattern" is nor what the pattern of alleged "atypical" flooding consists of. Determining whether a new pattern of flooding exists is difficult to do when Plaintiffs themselves apparently cannot state during which months of the year that pattern exists.

Groping about in the jurisdictional darkness, the government produced detailed evidence that controverted Plaintiffs' claims of a novel flooding pattern based on several possible

definitions of the farming season and historical flooding patterns.  Consulting a United States Department of Agriculture (USDA) report from October 2010, the government identified April, May, June, and July as the relevant months for the growing season of soybeans and corn in the region in which Plaintiffs' properties are located—the crops several Plaintiffs grow.[6]  Plaintiffs did not contradict the government's definition of the growing season in their response, ECF No. 40 at 32–33, though at oral argument they stated, without any evidentiary support, that the USDA's definition of the growing season for both corn and soybeans was "stale."  Oral Arg. at 63:18, ECF No. 48; *see SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("When a party includes no developed argumentation on a point . . . we treat the argument as waived under our well established rule." (alteration in original) (quoting *Anderson v. City of Boston*, 375 F.3d 71, 91 (1st Cir. 2004))).

Stale though the government's research on the relevant growing season *allegedly* may be, the amount of guesswork that the government had to perform to respond to Plaintiffs' complaint illustrates a basic flaw in the pleadings.  The elementary purpose of any complaint is to "put a defendant 'on notice as to what he must defend.'"  *Artrip v. Ball Corp.*, 735 F. App'x 708, 715 (Fed. Cir. 2018) (quoting *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)).  Plaintiffs' complaint told the government that it was being sued for just compensation for flooding caused by government-built structures near Paducah, Kentucky, but not when that flooding occurred besides nebulous comments about a growing season for non-specific crops grown by some, but not all, of Plaintiffs that extended into the month of July.  While Plaintiffs did not need to provide the precise start and end dates of when the alleged pattern of atypical flooding occurred, they had to at least describe with some level of precision what made the flooding atypical.  *See* RCFC 8(a)(2) ("A pleading that states a claim for relief must contain: (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief . . . .").  The government is not put on notice of the jurisdictional facts at the heart of Plaintiffs' claim that a new pattern of atypical flooding stabilized during the relevant statutory period if it does not know what the new pattern of atypical flooding consists of.  Plaintiffs' amended complaint gave the government precious little from which to build its response and is, therefore, jurisdictionally suspect.

---

[6] This taking allegedly occurred near the border between Illinois and Kentucky.  According to the government,

> [i]n Illinois, corn is typically planted between April 21 to May 23 and harvested between September 23 to November 5.  [ECF No. 35-12] at 38.  In Kentucky, corn for grain is typically planted between April 14 to May 24 and harvested between September 9 to October 24.  *Id.* at 39.  In Illinois, soybeans are typically planted between May 8 and June 12 and harvested between September 26 to October 26.  *Id.* at 38.  In Kentucky, soybeans are typically planted between May 16 and June 27 and harvested between October 10 and November 14.  *Id.* at 39.  Therefore, given Plaintiffs' focus on flooding in months prior to and including July, the United States presents data about flooding in May to July—months where the their [sic] crops would typically be planted and growing.

ECF No. 35 at 11 n.4.

Specificity in pleadings is especially important in just compensation cases. The Court's rules provide that "[i]n pleading a claim for just compensation under the Fifth Amendment of the United States Constitution, a party must identify the specific property interest alleged to have been taken by the United States." RCFC 9(i). Although this rule does not impose a heightened pleadings standard for just compensation cases, it "reflects the two-part analysis that this Court will conduct when [it] turn[s] to the merits to determine whether a compensable taking has occurred," namely whether the plaintiff has alleged a cognizable Fifth Amendment property interest and whether the government took that interest. *Schell & Kampeter, Inc. v. United States*, 159 Fed. Cl. 829, 832 (2022). The rule, therefore, guides the Court in deciding just compensation cases by preventing vague and overbroad claims. Even though the amended complaint specifies that Plaintiffs' claims are for "taking[s] of property and flowage easements without just compensation," ECF No. 32 ¶ 14, and sets out the various property uses with which the alleged new pattern of flooding pattern interferes, *id.* ¶¶ 17–36, it does not describe the temporal features of Plaintiffs' claims usefully. Plaintiffs had to describe when during the year their properties flooded to "a greater extent, duration[,] and frequency"; their statement that the flooding "extend[ed] into the month of July" says nothing useful about the extent or, arguably, frequency of the flooding, especially if their claims include non-July flooding. *Id.* ¶ 9. If temporality is an important aspect of a just compensation claim, as it is here, RCFC 9(i) requires clear description of those temporal aspects of the claim to give the government, and the Court for that matter, proper notice of the property interests at issue. Plaintiffs' amended complaint displays a notable lack of notice on this aspect of their claims.

Plaintiffs' failure on this issue is all the more galling because the Court specifically ordered them to specify "with more temporal particularity" when their just compensation claims for atypical flooding occurred. *Angelly*, 165 Fed. Cl. at 453. The Court asked specifically for "which months of the year" the atypical flooding occurred. *Id.* This level of specificity was necessary both to put the government on notice of the atypical flooding that is at issue in this case and to clarify a discrepancy from oral argument on the government's first motion to dismiss, where Plaintiffs' counsel claimed that the government owed them just compensation only for flooding during July. *See* Oral Arg. 69:6–9 (flooding in July is "the claim"); 65:24–25 ("I think the claim is solely this flooding that's extended into July . . . ."); 90:3–6 ("[M]aybe we don't have a claim outside of July because it always flooded, and so to the extent that it flooded a little bit more and it was caused by the Government, maybe that is stale."), ECF No. 34. The Court cannot construe Plaintiffs' claims as taking place exclusively in July for at least three reasons. First, Plaintiffs' amended complaint alleges that the atypical flooding was "extending into the month of July," not exclusively in the month of July. *See, e.g.*, ECF No. 32 ¶ 9. Second, as already mentioned, the amended complaint contains allegations of takings for Plaintiffs that alleged no July flooding on their property. *See id.* ¶¶ 21, 25, 28, 31. Third, Plaintiffs' counsel at the second oral argument stated explicitly that their claims *were not* exclusively for the month of July despite their previous representations.[7] Oral Arg. 45:18–23; 46:7–8; 55:12–13, ECF No. 48. These types of contradicting representations by counsel and vague pleadings by Plaintiffs are exactly why the Court ordered Plaintiffs to amend their complaint. Plaintiffs, however,

---

[7] This confusion about of what exactly the claims consist of is perhaps because Plaintiffs had different counsel arguing on their behalf at each oral argument, neither of whom were the counsel of record, who would ostensibly have written the briefs and complaints on behalf of Plaintiffs. *See* ECF No. 45 at 1.

essentially ignored the Court's command and filed an amended complaint that continues to fail to meet its obligation to put the government on notice as what constitutes "atypical flooding."

Plaintiffs had multiple opportunities to inform the Court and the government exactly what its alleged new pattern of flooding consists of, and to define it such that the government would be put on notice of exactly what is being alleged and such that the Court could determine whether the alleged new atypical flooding stabilized within the statute of limitations.  Without specific months (or parts of months) that the government could scrutinize, the amended complaint fails to give the government meaningful notice of the claims Plaintiffs brought and fails to comply with the Court's order regarding amendment of the complaint.[8]  For these reasons alone, the Court can dismiss Plaintiffs' case.

### 2.    Plaintiffs Failed to Meet Their Burden to Demonstrate Their Claims Stabilized Within the Statute of Limitations

Although the alleged new pattern of atypical flooding that Plaintiffs claim effected a taking of their properties is quite vague, the government has nonetheless produced evidence controverting the jurisdictional facts Plaintiffs allege in their amended complaint.  The government's hydrographic charts and expert testimony do not reveal any obvious change in flooding patterns on Plaintiffs' land, challenging Plaintiffs' facial assertion that a new pattern of flooding developed.  Because Plaintiffs failed to rebut the government's jurisdictional challenges by a preponderance of the evidence, the Court must conclude that it lacks jurisdiction over Plaintiffs' just compensation claims.

Learning from the mistakes it made in its first motion to dismiss, the government directly challenges, in its second motion to dismiss, Plaintiffs' allegation that a new flooding pattern emerged.  ECF No. 35 at 11.  Using Plaintiffs' flooding metric from their "own declarations attesting to the river gage and stage (water elevation) at which properties experience flooding," the government hired a hydrologist, Dr. Robert Holmes, Jr., to "compile gage data for the two gages referenced in Plaintiffs' prior declarations, plot that data in graphs, and tally the number of days gage readings exceeded the Plaintiff-defined elevations above which each subject property begins to flood."  *Id.* at 12–13.  The government performed a detailed analysis of the history of flooding on each set of Plaintiffs' property, *id.* 14–35, and argues that the data reveals "that 'natural seasonal flooding' has not been 'severely altered' at any point, much less within the statute of limitations period."  *Id.* at 14–35, 13 (quoting ECF No. 32 ¶ 120).  The government points specifically to data that suggests that Plaintiffs' properties "have experienced flooding in the first half of the corn and soybean growing season (May, June, and July) for decades."  *Id.* at 13.  This analysis differs from the evidence offered in support of the government's previous motion to dismiss, which consisted of general observations that flooding had always occurred on Plaintiffs' properties.  *See generally* ECF No. 15.  The evidence the government offered in support of its second motion to dismiss gave the Court concrete evidence that indicated there was no atypical flooding pattern that stabilized within the statutory period.  *See* ECF No. 35.  As Plaintiffs predicated their takings claim on the allegations that there was a new, atypical flooding

---

[8] Curiously, when the government suggested jurisdictional discovery to give it more clarity, Plaintiffs opposed strenuously.

pattern that for many Plaintiffs is "extending into the month of July," the government's evidence contradicting these allegations required Plaintiffs to respond.

Rather than producing their own evidence to attempt to meet their jurisdictional burden or hiring a hydrologist to provide an alternative interpretation of the government's data, in response to the government's motion Plaintiffs merely scrutinize the government's facts and figures. Plaintiffs contend that "[t]he Government's data do not put Plaintiffs' allegations into question, but rather confirm the emergence of an anomalous pattern of flooding on each property after 2015 and support Plaintiffs' allegations that they did not and could not perceive any deviation from historical norms until then." ECF No. 40 at 2. They cite, for example, the government's data on Plaintiff Julian Harris's property, which shows that it flooded in July three times this decade after having never done so since 1967, as Plaintiffs' affidavits stated. *Id.* at 10–11. Plaintiffs accuse the government of "cherry-picking the data it presents . . . to obscure the long-term flooding history on each property, which should be the starting point for the jurisdictional analysis." *Id.* at 12. Plaintiffs contend that "[t]o determine that a claim had accrued, Plaintiffs had to distinguish what they were currently experiencing from the flooding that had been happening 'for decades,'" and that "[f]or most Plaintiffs, the bright-line change was the emergence of a pattern of July flooding because it was a departure from past flooding and because July flooding (unlike flooding in May or June) makes it impossible to harvest a crop." *Id.* at 13. They state in conclusion that "[w]hether seasonal flooding has been altered is a merits question," and that, "based on the Government's own data, the change in flooding in recent years could not be clearer." *Id.* at 15, 16.

The question of whether seasonal flooding has been altered *may* be a merits question, but it is *certainly* a jurisdictional question in this case. It is axiomatic that a plaintiff must allege that its claim accrued within the statute of limitations in order for this Court to exercise jurisdiction over the claim. Once the government controverted Plaintiffs' allegations related to the accrual of their claims, Plaintiffs' allegations alone were insufficient to meet Plaintiffs' burden of establishing the Court's subject matter jurisdiction over their claims by a preponderance of the evidence. As the government has challenged whether a new pattern of flooding exists, Plaintiffs' burden was to prove by preponderant evidence that this alleged new pattern of flooding stabilized after July 30, 2015, six years from the date they filed their first complaint. ECF No. 1. Plaintiffs attempted to meet this burden with three items they assert support their claims of a new pattern of flooding: the affidavits of each set of Plaintiffs, stating that they only perceived a new pattern in 2019, ECF No. 40-1; the government's own charts containing the number of flooding days in each month on each Plaintiff's property, ECF No. 40-2; and portions of a deposition transcript that the government's hydrologist gave in another case, ECF No. 40-3. Without an alternative expert to inform the Court as to how the government's data supports Plaintiffs' contentions of a new pattern of flooding, Plaintiffs essentially argue that the government's data makes the pattern sufficiently obvious that the Court's untrained eye can perceive it. ECF No. 40 at 16.

The Court agrees with Plaintiffs that "the long-term flooding history on each property . . . should be the starting point for the jurisdictional analysis" of their claims and that the government's historical tables are helpful in this regard. *Id.* at 12. The Court disagrees with Plaintiffs, however, that the government's charts make the alleged new pattern of flooding

obvious enough to meet Plaintiffs' burden of proving jurisdiction. Plaintiffs analyzed the government's data with respect to two perceptible groups: those without any July flooding, but for whom "flooding increased dramatically" after 2015; and those with July flooding. *See id.* at 16–19, 19–29. As the July flooding cohort is the larger and more representative set, the Court begins its analysis there.

### a. July Flooding Plaintiffs

The sixteen July Flooding Plaintiffs have a common theory of a new pattern of atypical flooding. Although they do not state precisely of what this alleged new flooding pattern consists, they all allege that the fact that they have had between two and four July flooding events in the past decade proves that a new pattern has developed. *See* ECF No. 32 ¶¶ 17–20, 22–24, 26–27, 29–30, 32–36. Most focus specifically on July flooding during 2013, 2015, and 2019. ECF No. 40 at 19, 21–29. Using lead Plaintiff Gary Angelly as an example, they argue that Angelly's "6 days of July flooding in 2013, 23 days of July flooding in 2015[,] and 5 days of July flooding in 2019" is a new pattern of flooding because "[t]he Government's compilation reveals no July flooding whatsoever before 2013 on the Angelly property as far back as 1967." *Id.* at 19–20. The other Plaintiffs all make similar allegations, though the vast majority of them (eleven) have had July flooding on their properties in prior years. *See, e.g.*, ECF No. 40-2 at 15 (indicating that Plaintiff Zachary Workman had occasional July flooding on his property dating back to 1947).

The Court begins with the general observation that, despite Plaintiffs' accusations that the government "cherry-pick[ed]" in its reading of its own data, Plaintiffs could be accused of doing the same. ECF No. 40 at 12. They claim that the definitive evidence that there is a new flooding pattern is that their properties flooded at least two times in a decade during July. ECF No. 32 ¶¶ 17–20, 22–24, 26–27, 29–30, 32–36. Yet Plaintiffs fail to propound sufficiently on why flooding in July during two, three, or even four out of ten years is particularly notable given historical flooding trends. The government's historical data shows that some Plaintiffs' properties have, in the past, flooded twice in ten years or three times in eleven years during the month of July.[9] *See* ECF No. 40-2 at 7 (showing that the property owned by Plaintiff Weaks Farm, LLC flooded in July four times during the 2010s, but also that it flooded in July two times between 1950 and 1959, three times between 1947 and 1958, and two times between 1990 and 1999); *id.* at 7–15 (showing the same for eight other Plaintiffs). These recurrent instances of July flooding indicate that, while potentially "unprecedented" as Plaintiffs claim, the fact that one or two more flooding events than average extended into July in the 2010s is not as notable of a trend as Plaintiffs suggest. ECF No. 40 at 2. For instance, what is more significant about four floods in ten years (2010 to 2019) than three floods in twelve years (1947 to 1958) in terms of perceiving a pattern of flooding? Plaintiffs offer no answer to this question. Instead, they leave it to the Court to speculate whether one or two flooding events more than usual in July over the course of a decade represents a new pattern of atypical flooding. But one or two additional floods in a decade does not a new flooding pattern make, or at least not one facially obvious enough that the Court could discern its significance without the aid of some sort of expert opinion or other evidence on flooding patterns (which Plaintiffs failed to offer).

---

[9] Indeed, the Plaintiffs' response highlights this fact. ECF No. 40 at 28 ( "[T]here had been a run of July floods occurring in the years 1947, 1951 and 1958.").

Events in the succeeding years also cast doubt upon the relevance of an extra flooding event during the 2010s. None of the Plaintiffs' properties flooded during July in 2020, 2021, or 2022, the years immediately following the year when Plaintiffs' claims allegedly stabilized and for which date is available. *See generally* ECF No. 40-2. These years not only lacked July flooding, but, in the case of 2021 and 2022, lacked May and June flooding altogether for several Plaintiffs' properties. *See id.* at 12–21. Even using Plaintiffs' insufficient description of atypical flooding as "flood waters to a greater extent, duration[,] and frequency, notably extending into the month of July," the lack of flooding on several Plaintiffs' properties during May, June, and July in the years immediately following (when their claims allegedly stabilized) seems to undercut Plaintiffs' claim that any new pattern developed during the 2010s. ECF No. 32 ¶ 9. Lack of flooding for three successive years is exactly the opposite of the trend Plaintiffs suggest.

Plaintiffs' rhetorical posture regarding some of the years with July flooding is also confused. Plaintiffs' amended complaint states "a new pattern of flooding became apparent, which extended flooding into the month of July in multiple years between 2011 and 2019" for both Plaintiffs William Schroeder and Eric Van Cleve. ECF No. 32 ¶¶ 32, 33. In other words, they cite the fact that these Plaintiffs' properties flooded in July four times between 2011 and 2019 as evidence that a new pattern has emerged as an effect of the government's action. ECF No. 40-2 at 10–11. Yet Plaintiffs stated also that the change in the "historical hydrograph of the Rivers" was "exacerbated by the 2011 flood." ECF No. 32 ¶ 7. These two positions are not compatible: either the 2011 flood is evidence of a change in the flooding pattern on Plaintiffs' properties or it was a cause of the change.

The evidence that Plaintiffs cite to support their conclusion casts doubt upon their claims' plausibility. They cite the deposition testimony of a hydrologist, Dr. Robert Holmes, that he offered on behalf of the government in a case before Judge Hertling, *Riverview Farms v. United States*, 172 Fed. Cl. 672 (2024). ECF No. 40-3. They argue that Dr. Holmes's testimony supports their ability to adequately allege a stabilization of their claims only in 2019, despite July flooding having occurred in several years before that because, as he suggests, "it's almost [that] you don't know that there's a trend until you're well past the period you're in." ECF No. 40 at 15 (quoting ECF No. 40-3 at 241:19–22). Dr. Holmes also expressed doubt that he could perceive a new trend because of "natural climatic variation," which put the area at issue within "a very wet cycle in the last 10, 15 years." ECF No. 40-3 at 241:4, 56. Without the aid of a hydrologist, the Court's untrained eye perceives the July floodings both in the 2010s and in past years as sporadic rather than definable in a clear pattern. This characterization is compatible with Dr. Holmes's testimony that Plaintiffs themselves brought to the Court's attention. If the last 15 years have been a "very wet cycle," trend lines for flooding patterns are very difficult to determine as they occur, and the years immediately following the alleged year of stabilization indicate that only a slightly greater amount of flooding than normal occurred, then it is nearly impossible for the Court to conclude that there is a new flooding pattern. *Id*. at 241:6.

Plaintiffs' description of how the government's data supports their new flooding pattern allegations is where Plaintiffs' thin descriptive rubber meets the jurisdictional road. Plaintiffs contend that the government's "data . . . actually supports Plaintiffs' factual allegations," ECF No. 40 at 9, because it "neither refutes Plaintiffs' claims of the emergence of a pattern post-2015 nor demonstrates the accrual of a claim before 2015," *id*. at 9–10. Instead, according to

Plaintiffs, "it does the opposite . . . bolster[ing] Plaintiffs' specific factual allegations," by confirming that each Plaintiff did experience flooding in July as they claimed. *Id.* at 9. Plaintiffs chastise the government further by stating that it "does not identify *any* change in flooding prior to 2015 or explain when Plaintiffs were supposed to be able to identify a change to trigger a duty to investigate." *Id.* at 12.

Plaintiffs' argument has at least two flaws. First, it misplaces the burden of proof. The government does *not* have the burden to prove that no new pattern of flooding exists. Rather, Plaintiffs have the burden to prove that such a pattern exists and that it emerged within the statute of limitations. Second, Plaintiffs misunderstand the import of the government's presented data. Without a specific description of the pattern the Court is supposed to be looking at, the merely stating that the government's data allegedly "supports every fact that constitutes that pattern" does not undermine the government's main purpose in presenting the historical information: that no flooding pattern exists. *Id.* at 11; *see also* ECF No. 35 at 13 (arguing that "for all Plaintiffs, the evidence reveals that 'natural seasonal flooding' has not been 'severely altered' at any point, much less within the statute of limitations period" (quoting ECF No. 32 ¶ 120)). Though Plaintiffs assert that the government data supports their contention that a new flooding pattern stabilized in 2019, the Court does not see any obvious pattern in the data presented. As Plaintiffs produced no new evidence or expert testimony that supported a new flooding pattern as they described in their complaint, their burden was to explain and describe to the Court how the government's data shows that such a pattern exists. Merely pointing out that the government's data supports some of Plaintiffs' allegations that they have experienced July flooding does not bolster their complaint regarding the jurisdictional fact in dispute: whether there is a new flooding pattern that stabilized within the statute of limitations. The fact that there were two, three, or even four July floods in a decade, in an area that historically floods and where many of Plaintiffs' properties had previous July flooding, does not suggest a new pattern to the Court, and, if it should have, Plaintiffs had to offer more evidence as to why.

Plaintiffs come closest to describing how the government's data shows a new flooding pattern regarding three Plaintiffs: Gary Angelly, Mary and Paul Baumer, and Julian Harris.[10] The government's data shows that each of their properties had not flooded at all during July dating back to 1967, then the properties flooded three times in that month during the 2010s. ECF No. 40-2 at 16–18. The alleged pattern here is more discernable: unlike those Plaintiffs that experienced flooding recurrently in July for many decades, these Plaintiffs have experienced it multiple times within the last decade after never having done so before. Plaintiffs consider it "disingenuous for the Government to assert that [Plaintiffs] should have perceived that a claim had accrued . . . before 2015," given the novelty of these July floodings. ECF No. 40 at 23.

This argument would be significantly stronger had the July Flooding Plaintiffs claimed just compensation only for July flooding. Plaintiffs claimed instead that their flooding was for "flood waters to a greater extent, duration[,] and frequency, notably *extending into* the month of July, in a manner that deviates from historical flooding patterns." ECF No. 32 ¶ 9 (emphasis

---

[10] Plaintiffs Wings and Water Hunting Club and Rick Roberts could arguably be considered part of this list, as they experienced July flooding for the first time ever on their properties in the 2010s as well. ECF No. 40-2 at 20–21. Each only had two years of the July flooding during the decade rather than Angelly's, the Baumers', and Harris's three, making their claims of a pattern less clear.

added); *see also see also id.* ¶ 19 ("Plaintiffs . . . were deprived of the use and enjoyment of their land . . . due to unseasonal and Atypical Flooding *during the peak farming season* . . . ." (emphasis added)).  As insufficient as this description is, it indicates that their takings claims are for more than just July floodings.  The Court favors this interpretation both because it comports with the natural reading of the words "extending into the month of July," and because Plaintiffs disclaimed any intention to pursue only July flooding takings at the Court's hearing on the government's second motion to dismiss.  Oral Arg. at 45:18–23, ECF No. 48.  Although July flooding on these Plaintiffs' properties during the previous decade may appear somewhat novel, it does not necessarily indicate a pattern of flooding "to a greater extent" or "frequency" than in the years prior.  The government's data table presents the data on flooding days on Plaintiff Gary Angelly's property:

**Table 1** – Number of days of flood, as determined when observed river stage exceeds the Plaintiff-defined flood threshold, from 1967 to 2022, broken out by months and year for Gary Angelly's property.  ECF No. 40-2 at 16.

**GARY ANGELLY: Number of Flooding Days per Month (1967-2022)**

| Calendar Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1967 | 0 | 0 | 19 | 0 | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 35 |
| 1968 | 0 | 0 | 6 | 12 | 2 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 32 |
| 1969 | 0 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17 |
| 1970 | 4 | 0 | 0 | 13 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29 |
| 1971 | 0 | 6 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 19 |
| 1972 | 0 | 0 | 14 | 14 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 21 | 57 |
| 1973 | 11 | 3 | 19 | 30 | 20 | 2 | 0 | 0 | 0 | 0 | 0 | 11 | 96 |
| 1974 | 31 | 14 | 13 | 11 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 74 |
| 1975 | 7 | 17 | 31 | 17 | 12 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 84 |
| 1976 | 7 | 8 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 18 |
| 1977 | 0 | 0 | 6 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 26 |
| 1978 | 1 | 5 | 16 | 7 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 44 |
| 1979 | 19 | 5 | 28 | 29 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 5 | 88 |
| 1980 | 0 | 0 | 11 | 23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 34 |
| 1981 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1982 | 6 | 22 | 16 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 54 |
| 1983 | 6 | 0 | 0 | 22 | 31 | 5 | 0 | 0 | 0 | 0 | 0 | 5 | 69 |
| 1984 | 0 | 0 | 8 | 24 | 26 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 58 |
| 1985 | 3 | 2 | 20 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 42 |
| 1986 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1987 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| 1988 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1989 | 9 | 14 | 17 | 13 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 58 |
| 1990 | 0 | 26 | 1 | 0 | 12 | 7 | 0 | 0 | 0 | 0 | 0 | 11 | 57 |
| 1991 | 24 | 11 | 12 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 64 |
| 1992 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1993 | 0 | 0 | 18 | 16 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 42 |
| 1994 | 4 | 28 | 26 | 30 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 92 |
| 1995 | 5 | 0 | 8 | 0 | 14 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 35 |
| 1996 | 8 | 7 | 7 | 1 | 31 | 15 | 0 | 0 | 0 | 0 | 0 | 14 | 83 |
| 1997 | 3 | 10 | 31 | 1 | 0 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 63 |
| 1998 | 8 | 1 | 5 | 14 | 17 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 47 |
| 1999 | 9 | 10 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22 |
| 2000 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| 2001 | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 8 | 16 |
| 2002 | 6 | 3 | 13 | 7 | 28 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 58 |
| 2003 | 0 | 10 | 0 | 0 | 7 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 18 |
| 2004 | 10 | 11 | 8 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | 0 | 18 | 55 |
| 2005 | 25 | 0 | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 30 |
| 2006 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| 2007 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 |
| 2008 | 0 | 13 | 25 | 19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 57 |
| 2009 | 0 | 0 | 0 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 21 |
| 2010 | 7 | 13 | 5 | 0 | 15 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 |
| 2011 | 0 | 2 | 31 | 20 | 31 | 1 | 0 | 0 | 0 | 0 | 1 | 20 | 106 |
| 2012 | 10 | 7 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 19 |
| 2013 | 11 | 6 | 5 | 9 | 17 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 54 |
| 2014 | 0 | 0 | 3 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 |
| 2015 | 0 | 0 | 23 | 21 | 0 | 0 | 23 | 0 | 0 | 0 | 0 | 5 | 72 |
| 2016 | 16 | 10 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 33 |
| 2017 | 0 | 0 | 0 | 1 | 21 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22 |
| 2018 | 0 | 16 | 18 | 30 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 75 |
| 2019 | 24 | 26 | 25 | 13 | 17 | 16 | 5 | 0 | 0 | 0 | 0 | 1 | 127 |
| 2020 | 28 | 22 | 27 | 20 | 18 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 117 |
| 2021 | 0 | 0 | 31 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 39 |
| 2022 | 13 | 7 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 40 |

—— July 30, 2015–July 30, 2021

The flooding on Plaintiff Gary Angelly's property does not indicate a clear, new pattern of flooding of the type that Plaintiffs describe, despite the new July flooding.  Angelly's property flooded in July for six days in 2013, twenty-three days in 2015, and five days in 2019.  *Id.* Angelly's property did not flood at all in May or June of 2015, nor did it flood in June at all in 2013.  *Id.*  Flooding in those years did not, therefore, "extend[] into the month of July"—it just happened to flood in July.  The 2010s were not a particularly notable decade for flooding on Angelly's property, as several years had as few as thirteen (2014) and nineteen (2012) days of flooding.  *Id.*  The years 2011, 2019 and 2020 were particularly wet years, as they saw all-time

high flood totals of 106, 127 and 117 days, respectively.  *Id.*  Even in these years of high flooding, however, there was no July flooding in 2011 or 2020, and the total amount of flooding days does not differ dramatically from several years in the past.  *Id.* (flooding for 96 days in 1973 and 83 days in 1996).  The years 2011, 2019, and 2020 seem to have been particularly intense years for flooding for all Plaintiffs and seem to be outliers rather than illustrative of a trend in flooding patterns.  *Accord id.* at 21 (flooding 68 days in 2011, 111 days in 2019, and 47 days in 2020).  The flooding numbers have, furthermore, regressed to the mean on Angelly's property in the last three years for which the government had data.  *Id.* at 16.  With this context, the July flooding on Angelly's property appears more sporadic than indicative of a new flooding pattern, even if somewhat novel.  This characterization is compatible with Dr. Holmes's testimony, which Plaintiffs argue supports their case, that the area at issue has been "in a very wet cycle in the last 10 [or] 15 years."  ECF No. 40-3 at 241:6.  Perhaps a hydrologist could perceive that the July flooding on Angelly's property indicates a radical new flooding pattern.[11]  As the Plaintiffs did not provide one, the Court's untrained eye perceives no pattern.[12]

Additionally, as discussed above, Plaintiffs' claim is that the new pattern of flooding is for flooding extending into July, not simply July flooding.  In other words, Plaintiffs are alleging flooding during what they call the "growing season" or "farming season."  But when the Court looks more broadly than at just the flooding that extended into July on Angelly's property—at flooding during the so-called growing or farming season—there appear to be other periods with multiple years of growing or farming season flooding.  For instance, according to the chart regarding flooding on the Angelly property, the 1990s had one more year with flooding in May and/or June (seven years) than did the 2010s (six years).  EFC No. 40-2 at 16.  Granted, none of these floods extended into July, but Plaintiffs' claims are broader than just July flooding.  As discussed above, Plaintiffs offered no evidence to rebut the government's evidence regarding what constitutes the growing season, which, according to the government, includes May and June.  Yet, May and June flooding is not new on the July Flooding Plaintiffs' properties, as the data on the Angelly property reveals.  Nor does the flooding during this time of the year appear all that remarkable over time as represented on the following chart of flooding on the Angelly property:

---

[11] The Court is sympathetic to the timing constraints that litigation provides for obtaining an expert.  If Plaintiffs had requested more time to file their response to the government's second motion to dismiss to respond to the latter's expert-curated data questioning the jurisdictional facts, the Court would likely have granted it, as the Court did both for the government and Plaintiffs several times throughout litigation.  *See, e.g.,* ECF No. 7 (granting the government's initial consent motion for extension of time to prepare expert testimony to respond to Plaintiffs' complex just compensation case); ECF No. 19 (granting Plaintiffs' motion for extension of time to respond to government's first motion to dismiss); ECF No. 31 (granting joint motion for extension of time to file amended complaint and respondent briefing).

[12] Plaintiffs Mary and Paul Baumer's and Julian Harris's flooding totals mostly mirror Gary Angelly's.  *Compare* ECF No. 40-2 at 16, *with id.* at 17, 18.  The analysis, therefore, would be the same for any of these Plaintiffs.



As the above chart (and many others in the evidence the government offered) illustrates, if there is some new pattern of atypical flooding it is exceedingly hard to see.

None of these flaws in the July Flooding Plaintiffs' pleadings and response to the government's second motion to dismiss alone preclude the possibility that the government's actions caused a new pattern of flooding on their properties for which it owes just compensation. Together, however, they place Plaintiffs' alleged pattern in significant doubt. Once the government presented evidence that, according to the government, showed "'that [the] natural seasonal flooding' has not been 'severely altered' at any point, much less within the statute of limitations period," ECF No. 35 at 13 (quoting ECF No. 32 ¶ 120), Plaintiffs had the burden not only to allege that there was a new pattern that stabilized within the statute of limitations, but also to either produce evidence indicating a new pattern or explain how the government's data illustrated one. The Court's reading of the government's data does not support a pattern based on anywhere between two and four July flooding events in a decade on properties that have historically flooded throughout the year, including during the growing or farming season, nor is it persuaded by Plaintiffs' explanations to the contrary. Plaintiffs' evidence, or lack thereof, left the Court combing through charts of flooding data that shows plenty of historic growing or farming season flooding on Plaintiffs' properties, to include historic flooding extending into July. Plaintiffs simply did not meet their burden for the July Flooding Plaintiffs. They did not demonstrate by preponderant evidence that a new pattern of atypical flooding stabilized within the statute of limitations. *See Cedars-Sinai Medical Center*, 11 F.3d at 1584 ("The government's factual challenge to the court's jurisdiction placed the burden on Cedars to demonstrate facts

sufficient to support its contention regarding the court's jurisdiction. Once challenged, allegations alone are insufficient to meet the complainant's burden.").

### b. Non-July Flooding Plaintiffs

Four of the twenty Plaintiffs do not allege any July flooding at all. Unlike the sixteen July Flooding Plaintiffs, none of these four Plaintiffs have historically experienced much flooding on their properties. ECF No. 32 ¶¶ 21, 25, 28, 31. They contend that "a new pattern of flooding became apparent when three flooding events in a single decade" waterlogged each of their properties. *Id.* ¶ 21; *see id.* ¶¶ 25, 28.[13] Their argument is very similar to the July Flooding Plaintiffs' argument in that they perceive a pattern from three flooding events in the 2010s, except that the non-July Flooding Plaintiffs perceive any flooding days in three years in a decade as indicative of a new flooding pattern. For the same reasons as the July Flooding Plaintiffs, without any context or expert testimony in support, the Court does not find any pattern emerges from the government's data.

The four non-July Flooding Plaintiffs do not allege very much flooding at all, and it is difficult to discern a pattern from so few instances of flooding no matter how "exceptional" they are. Plaintiff Anthony Dunker is representative of the four non-July Plaintiffs. His property flooded nineteen days in 1937, two days in 1975, and seven days in 1997, but no other years until 2011. ECF No. 40-2 at 2. It then flooded eighteen days in 2011, two days in 2016, and five days in 2019. *Id.* The flooding occurred in April and May of 2011, January of 2016, and February and March of 2019. *Id.* Plaintiffs state that the non-July Flooding Plaintiffs, including Dunker, have "experienced flooding in recent years that was more frequent than at any other point in history," for the "difference in the percentage of years in which flooding occurred in these two periods is staggering[:] From 1930 to 2010 the percentage of years in which flooding occurred is 3.7%. From 2011-2021 it is 25%." ECF No. 40 at 16, 17. They contend that, while "[t]he 2011 flooding could have been seen as an anomaly much like the flooding events of the past, [] when the flooding occurred again in 2016 and then in 2019, it was clear that a pattern was emerging."[14] *Id.* at 17. The below table presents the flooding data on Mr. Dunker's property dating back to 1930:

---

[13] Plaintiff SRH, LLC had flooding only twice in the 2010s rather than 3 times. *Id.* ¶ 31.

[14] The other three non-July Plaintiffs have similar trends. *See* ECF No. 40 at 18 ("From 1930 through 2010, [Plaintiff Kevin Morrison's] property experienced flooding in 3 of 81 years. From 2011 through 2022, the property experienced flooding in 3 of 12 years: 2011, 2016 and 2019." (citation omitted)); *see also id.* ("In 43 years, [Plaintiff Mary King's] property flooded in only 2 years. In the last 12 years, the property flooded in 3 years, with flooding occurring in consecutive years – something which had never occurred before."); *see also id.* at 19 ("Like the King property, in 43 years, the SRH property flooded in only 2 years. However, the property has flooded in 3 of the last 12 years and again in consecutive years.").



**Table 2** – Number of days of flooding, as determined when observed river stage exceeds the Plaintiff-defined flood threshold, from 1930 to 2022, broken out by months and year for Anthony Dunker's property.  ECF No. 40-2 at 2.

As the table illustrates, the non-July Flooding Plaintiffs offer no better evidence of a new pattern emerging than their July Flooding brethren.  First, just like some of the July Flooding Plaintiffs, they cannot make up their mind about whether the flooding in 2011 was part of the cause of the new flooding pattern or evidence of its effects.  *Compare* ECF No. 32 ¶ 21 (arguing that "a new pattern of flooding became apparent when three flooding events in a single decade[, including 2011,] flooded the cabin on the Dunker property"), *with id.* ¶ 7 (stating that the change in the "historical hydrograph of the Rivers" was "exacerbated by the 2011 flood").  Plaintiffs cannot have the 2011 floods be evidence of effects when it suits them and a cause when it does not.  Second, a few days of flooding in three years of a decade seems more sporadic than consistent, especially considering there is some history of flooding on the properties in question.  And two of the four non-July Flooding Plaintiffs only experienced a single day of flooding in one of the three years they claim constitutes a pattern.  *See* 40-2 at 3, 5.  Moreover, Dr. Holmes, whom Plaintiffs cite as supporting their case, stated that there exists "natural climatic variation" to flooding patterns, and that the past ten-to-fifteen years have been "a very wet cycle."  ECF No. 40-3 at 241:4.  He also reported that "it's almost [that] you don't know that there's a trend until you're well past the period you're in."  *Id.* at 241:19–21.  If both statements are true, and Plaintiffs submit that they are, then the new flooding is more consistent with climatic variations caused by a wet cycle than a new pattern of atypical flooding that only became apparent within the statute of limitations.  This explanation is especially persuasive because over ninety percent

of the river training structures at issue here were built by 2000. ECF No. 35 at 4. It would appear somewhat unlikely, therefore, that those river training structures would have caused a change in flooding only during the 2010s. Furthermore, Dr. Holmes's statements suggest that it takes many years after a trend develops for even trained hydrologists to discern that trend. It is now only a few years after the flooding that Plaintiffs allege, and Plaintiffs' properties have not flooded in the three years after 2019, according to the government data. ECF No. 40-2 at 2–5. The Court cannot find, based on its own lay review of the data, that Plaintiffs have met their burden to prove that a new pattern has emerged given that their own evidence states that discerning a flooding pattern close in time to the years in question is difficult to do.

Putting aside these background evidentiary concerns, the non-July Flooding Plaintiffs have a more obvious problem preventing them from arguing effectively that a new flooding pattern emerged on their properties: the distinct lack of data from which to draw such a pattern. As the government's table indicates, Plaintiff Anthony Dunker's property flooded much less frequently than the July Flooding Plaintiffs' properties. *Id.* at 2. His property had flooded in years' past, however, flooding nineteen days in 1937, two days in 1975, and seven days in 1997.[15] *Id.* The eighteen days in 2011, two days in 2016, and five days in 2019 that Dunker's property flooded stand out as somewhat more frequent than prior years, but the Court hesitates to infer a new flooding pattern from so few data points without any expert hydrological testimony on which to base its opinion. While it is accurate to say that Dunker's property "experienced flooding in recent years that was more frequent than at any other point in history," the relatively small amount of flooding days necessarily lessens the rhetorical weight of this description for the purposes of discerning a new flooding pattern. ECF No. 40 at 16. As with the July Flooding Plaintiffs' flooding data, the non-July Flooding Plaintiffs' slight increase in flooding days in successive years may be significant for a hydrologist. The Court, however, must rely only on its untrained observations because Plaintiffs failed to provide such a hydrologist. Those lay observations reveal no new pattern.

Moreover, without a demonstrable pattern, a few isolated floodings are insufficient to support a just compensation claim based on flooding. Although courts have held that the repeated, though temporary, inundation of land can be a physical taking requiring compensation, *see, e.g.*, *United States v. Cress*, 243 U.S. 316, 328 (1917), flooding that can be characterized as a random occurrence, not inevitably recurring, does not amount to a taking of property, *see, e.g.*, *Wilfong v. United States*, 202 Ct. Cl. 616, 622 (1973). Stated differently, "isolated invasions, such as one or two floodings . . ., do not make a taking . . ., but repeated invasions of the same type have often been held to result in an involuntary servitude." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1357 (Fed. Cir. 2003) (alterations in original) (quoting *Eyherabide v. United States*, 170 Ct. Cl. 598, 604 (1965)). This is because "[i]n order for a taking to occur, the effect of such flooding must be permanent rather than simply a random event induced more by an extraordinary natural phenomenon than by Government interference." *Wilfong*, 202 Ct. Cl. at 622. The non-July Flooding Plaintiffs have failed to meet their burden of showing that a new pattern of repeated physical invasions by flooding has emerged within the statute of limitations.

---

[15] All the non-July Plaintiffs had some flooding on their properties prior to the 2010s. ECF No. 40-2 at 3 (flooding on Mary King's property for one day in 1975 and seven days in 1997); *id*. at 4 (flooding on Kevin Morrison's property for nineteen days in 1937, two days in 1975, and seven days in 1997); *id*. at 5 (flooding on SRH LLC's property for one day in 1975 and seven days in 1997).

\*     \*     \*

In this case, Plaintiffs had the burden to convince the Court by a preponderance of the evidence that there was a new flooding pattern on Plaintiffs' properties that stabilized within the statute of limitations. Without preponderant evidence to support the emergence of a new flooding pattern that stabilized after July 30, 2015, the Court lacks jurisdiction and must dismiss the case. As discussed at length above, the Court simply cannot find a new flooding pattern by preponderant evidence because Plaintiffs have provided so little evidence in support of their burden of proof. Plaintiffs essentially left it to the Court to discern its own pattern of flooding based on the Court's perception of flooding during a single decade versus historic flooding on Plaintiffs' properties as presented in the evidence offered by the *government*. Although this may have been sufficient to meet the burden of proof had the pattern been obvious, here the obviousness of this alleged new pattern of atypical flooding is lacking. Maybe an expert could have offered better evidence to support Plaintiffs' position, but Plaintiffs offered no such evidence. Plaintiffs simply have not shown that it is more likely than not that there is a new flooding pattern on their properties; consequently, no such pattern could have stabilized within this Court's statute of limitations. The Court, therefore, lacks jurisdiction over Plaintiffs' just compensation claims.

## CONCLUSION

For the foregoing reasons, the Court lacks subject matter jurisdiction over Plaintiffs' claims and **GRANTS** the government's motion to dismiss under RCFC 12(b)(1). The Clerk shall enter **JUDGMENT** accordingly.

**IT IS SO ORDERED**.

<u>s/ Zachary N. Somers</u>
ZACHARY N. SOMERS
Judge